(75 South. 731)

No. 22203.

BROOKS v. TEXAS & P. RY. CO.

(April 16, 1917. Rehearing Denied June 11, 1917.)

*(Syllabus by the Court.)*

RAILROADS ☞359(1), 398(1)—KILLING PERSON ON TRACK—LIABILITY—EVIDENCE.

While a right of recovery may exist in the event of the killing by a train of a person who lies asleep or intoxicated upon a railroad track, the evidence in support of the action should be clear and satisfactory to the effect that, by the exercise of ordinary diligence by the person in charge of the train, the peril of the other might have been discovered and the killing avoided.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1238, 1356, 1363.]

Appeal from Thirteenth Judicial District Court, Parish of Rapides; James Andrews, Judge.

Action by Lovinia Augustin Brooks against the Texas & Pacific Railway Company. Judgment for plaintiff, and defendant appeals. Judgment annulled, and judgment for defendant dismissing the suit.

Howe, Fenner, Spencer & Cocke, of New Orleans, and Wm. H. Peterman, of Alexandria, for appellant. J. W. Joffrion, of Marksville, and Blackman, Overton & Dawkins, of Alexandria, for appellee.

### Statement of the Case.

MONROE, C. J. This is an appeal by defendant from a judgment for $5,000 obtained by plaintiff, as the widow of Randolph (called "Curley") Brooks, as damages for injury said to have been sustained by her in the killing of her husband through the alleged negligence of defendant, one of whose trains ran over him on the night of July 24–25, 1913.

It appears from the evidence that the decedent was employed and lived at Meeker, a flag station on defendant's road about two miles east of Lecompte, and that on Saturday, July 24th, he went to Lecompte, and that night joined a party of men of his own (the negro) race and condition who had been gambling and drinking all that day at a barroom and gambling resort, and remained with them until midnight, when, the place being closed, he went to a restaurant at which he was stopping, and, after remaining there for a while, and possibly obtaining a meal, started to return home by way of the railroad track. He was accompanied in leaving the restaurant by the sister of the proprietor and her daughter, who lived at Lecompte and were returning to their domicile, and, having reached the railroad, where their ways parted, the elder woman invited plaintiff to spend the night at her house, an invitation which he declined, and when she last saw him he

was walking down the track in the direction of Meeker. She testifies that he appeared to have been drinking, but that he was in possession of his senses, and could walk and talk, and that he continued to talk, over his shoulder, as he walked down the track. It must then have been after 1 o'clock (in the morning of Sunday, July 25th), for it is shown that the train which next passed over the road was No. 52, and that it left Lecompte, going east at, say 1:32, and decedent's body was found on the track later in the day, at a point about 3,750 feet east of that station.

Among the men whom he had met at the barroom were Henry Scott, Maddox Brown, and "Slim" Johnson. Scott says, in his testimony, "We alls was in the back room of the saloon drinking." Being asked, "Were Slim and Maddox with you all day," he replied "No, sir; but we was all right around there, right around the saloon there." And, answering the question, "What time that day did you meet Curley Brooks, first," he said "It was night; I suppose he come in after he got off from his work; it was night when he come into the saloon." The three men named, in view of the closing of the saloon at midnight, had an understanding that they would take the train for Cheneyville, a regular passenger station seven miles east of Lecompte, where there was a working camp in which they were assured of finding further amusement, and they met at the depot about the time that train No. 52, going east, was due, and, when it went out, attempted to find places on the "blind baggage" car. They say, however, that Scott was unable to get on by reason of the fact that the place was crowded, and that he went forward to secure a position on the pilot of the engine, and he says that the position that he secured was astride of the drawhead, which he rode in that way to Cheneyville, where he continued his carouse during the rest of the night and until the next evening. He further testifies that there was no moon that night, and he was unable to remember whether or not it was cloudy; that he kept his head down and his hat pulled down, in order to keep the gnats and the wind out of his eyes, but that, notwithstanding those disadvantages and the further fact (to which he testifies) that there was a little curve in the track at that point, he looked forward as far as he could without raising his head, and was able to see an object lying upon the track at a distance of 450 or 600 feet, which, when the locomotive was about to strike it, he recognized to be Curley Brooks, and that, if his hat had not been pulled down he could have seen the object at a greater distance; "could have seen it a mile."

He testifies that Brooks was lying "right down next to the right-hand rail," with his head to the east, his feet in the direction of the train, and his face toward the middle of the track, and that no part of him was lying across the track, diagonally or otherwise. He further says that he mentioned the occurrence to his companions, Maddox and Slim, when they reached Cheneyville, and told them that it was Curley who had been run over, and they corroborate that testimony, but it is shown that they had previously stated to the claim agent of the defendant that he did not tell them that he knew who it was that had been run over. It is not pretended that either of them mentioned the subject to any of the railroad employés at Cheneyville, or that they participated in the identification of the remains on the following day, when at Lecompte the inquest was held, though there appears to have been some question about the identification, and Maddox and Slim, if not Scott, were in Lecompte at that time.

No member of the train crew heard anything or knew anything of the accident at the time, or heard of it for a month afterwards, and the engineer who was in charge

of the locomotive, having no specific recollection either of the usual incidents or of anything unusual, testified on that basis that nothing unusual occurred within his knowledge; that a strict lookout ahead was kept by him; that the train at the time of the accident was probably moving at the rate of 15 miles an hour; that at that speed it might have been stopped by the use of the emergency appliances within 100 feet; that the rays of the headlight strike the track about 75 feet in front of the locomotive; that on a clear night and straight track he could see an obstruction "like a man standing upright, or an animal, not lying down," at a distance of a quarter of a mile; that in such case a man cannot be distinguished from a mule or cow at a distance of more than 100 or 200 feet; that a man lying down could not be distinguished from a pile of cinders (of which there are plenty on the road) unless the track is perfectly clean, "clean as white marble"; that, in riding astride of the drawhead, a person has about 8 inches of iron to sit on and would have to hold on (to the coupling lever) and have a very uncomfortable ride.

Scroggs, defendant's section foreman, testifies that the track, which was ballasted with gravel, with a flat surface flush with the surface of the ties, had upon it a growth of grass to the height of the rails; that, as indicated to him, the decedent was lying upon the left side of the track. Dr. Henry, the coroner, also testifies that decedent's body was found by him on the left side of the track, though parts of the remains were scattered along further to the eastward; his testimony on that subject reading as follows:

"The trunk, that is, the body, was in the weeds on the left side of the track, and when we got to the body the buzzards had been there and they had eaten off his arm and a good portion of his viscera. There was an arm intact that I picked up down the track, but, of course, that was bruised, too, and part of the skin scratched off. Q. On which side of the track, Doctor, passing Cheneyville, was the body found? A. On the left side. Q. That would be on the fireman's side. A. Yes, sir; that is the body was found there."

On cross-examination:

"Q. Doctor, starting from Lecompte and going towards Meeker, please state, as best you can recollect, where you found the different parts of the remains, and what parts they were? A. Well, let me see; I suppose it was about probably half a mile from Lecompte that I found the first part of the remains, I believe one of his shoes, on the right-hand side of the track. I went down a little bit and found an arm, I think, just the forearm and hand. Q. Was that on the right side, too? A. No, sir; that was in the middle of the track, and I think we found some parts and more parts down a little further, and, after going down 100 yards or more, I retraced my steps and came back towards Lecompte and found the body lying 10 feet from the top, down in the ditch. Q. How far was that body from where you had found that shoe, which was the first thing you found? A. It may have been, as well as I can remember, about 50 feet. Q. Did you find any other parts of the body between the shoe itself and the body itself, that you now recollect. A. I don't remember distinctly. I remember picking up several small particles, but I don't remember distinctly whether they were between the body and the shoe or not. Q. Would you say that the indications were that the body had been pushed along the track for some appreciable distance before it was thrown off. A. Well I can't say; there was no occasion for it. Q. You found the shoe, you say, about 50 feet down; as I understand, the shoe was the first thing found? A. Yes, sir; but the body was between the shoe and Lecompte. Q. The arm was on the track? A. The arm was on the track. Q. And there were also other parts of the body on the track? A. Yes, sir; scattered along. Q. How much of the body was left, of the main body that you found? A. Why, there was the trunk and the part of the head and, let me see, it seems to me that the lower parts were attached to the body, and one arm, I believe. Q. And the rest was scattered up and down the track for some distance? A. Yes, sir."

Plaintiff called to the stand a witness who for a number of years was a machinist, engaged in overhauling and repairing locomotives, and had attained the position of general foreman. He gave it as his opinion that, with a headlight in good condition, an engineer should be able to see and identify as a human being a man lying upon a track at a distance of at least 200 yards, and, if the night is not too dark, 400 yards. On cross-examination the witness said that he has not

been in the railroad business since 1913 and has never been a locomotive engineer or operated a locomotive. He was asked a hypothetical question as to the probability of the engineer seeing a man lying next to and parallel with the right rail, which is raised an inch, because of a curve to the left, in a track upon which the grass is rail high between the cross-ties, and his answer was:

"That rail, being elevated on the engineer's side, would make it more visible to him because it elevated the side nearest to him, and, so long as the grass didn't cover the man and was not high enough to hide his view, I am of the honest opinion that within 200 yards he should have been seen."

## Opinion.

It seems obvious to us that, when a railroad track curves to the left, it tends to disappear from the range of vision of an engineer, seated upon the right of a locomotive, entering the curve, and, if the curve be a sharp one, will actually disappear, save for a very short stretch. The witness last quoted did not, however, attempt to qualify as a general expert in natural science or in those branches which deal with light and optics. He said, when placed on the stand:

"My experience was altogether with locomotives, in overhauling and repairing them and doing anything necessary for them to go over the road."

From which we infer that the most that his duties required of him, in connection with electric headlights, was to see that they were placed in their proper positions on the locomotives, and that he never had occasion to determine, by experience, at what distance such a light would enable him to identify from the cab of a locomotive in motion an object lying upon the track in front of him as a human being; and the same is true of defendant's engineer, who testifies that he has no recollection of ever having seen any one lying on a track at night. From the view that we take of the case, however, we think it unnecessary to devote any time to the consideration of the question thus mentioned; that view being that plaintiff has failed to produce sufficient evidence to satisfy us that Curley Brooks was killed while lying on defendant's track. Scott testified that he was lying next to the right rail. The coroner found his body in the weeds in a ditch upon the left side of the track, and he testifies that there was no occasion for its having been pushed along the track, and we can see no reason why it should have been thrown from one side to the other. If, then, Scott did not see the body where he says he did, his testimony, as tending to show that it was so situated that the engineer should have seen it, is of no value; beyond which that testimony comes from a doubtful source and is absolutely uncorroborated. Scott not only admits, but rather boasts, that he had been drinking and gambling steadily for the 12 or 18 hours immediately preceding the moment when (according to his testimony) he saw what he describes, and, though he made his observations between 1 and 2 o'clock in the morning, when fresh from the scene of his dissipation, with the fumes of his liquor still in his head, and while seeking a new field, astride of the drawhead of a locomotive moving at the rate of 15 miles an hour, and when he was obliged to keep his head down and his hat pulled over his eyes in order to protect them from the gnats and the wind, he undertakes to swear that, if he had raised his head and looked, he could have seen Curley lying as he was for a mile, and, in fact, did see him, and recognized him to be a man, at a distance of 450 or 600 feet, after which, and as the engine was about to strike him, he identified him as Curley Brooks, though he was unable to say whether he was clad in a coat, a jumper, or shirt sleeves. One of his companions testifies that in the midst of their scramble to get on the blind baggage, and when Scott, finding that he could not crowd in, went for-

ward, he (the witness) found time to "peek" out and saw him get on the pilot of the engine, and that is the only testimony that we find tending to corroborate Scott in his statement he rode on the drawhead, no one having seen him in that position. The finding of the remains by the coroner and their identification by Curley's brother and by a woman (not the plaintiff) who appeared upon the scene as Mrs. Brooks and the burial of the remains sufficiently establishes the death of Curley, but it does not corroborate Scott's testimony to the effect that he was present at the death, and the fact that neither he nor his companions appeared at the inquest to aid in the identification and in the effort of the coroner to find out how the death came about is rather the reverse of corroborative. The remaining point in his testimony, being that upon which plaintiff's right of recovery really depends, relates to the position of the decedent at the time that he was killed, and in that respect it is entirely uncorroborated. It is true that he and his two companions testify that he made a statement to them on their arrival at Cheneyville, and what he is said to have told them of what he saw is thought to be corroborative of what he testifies that he saw. Conceding that in a measure it may be so, we find, according to Slim, that what he told them (and Slim swears that it was told both of them at the same time) was, "The train runned over Curley Brooks between Meeker and Lecompte," and, according to Maddox, that: "He said he thinked the train had runned over Randolph [otherwise called Curley]. He said the train run over a man, and he thinked it was Randolph. By plaintiff's counsel: 'He said the train ran over a man and he thinked' it was Randolph? A. Yes, sir. * * * Q. To whom did he tell this? A. To I and Slim." It is not stated by the witnesses that Scott gave them any of the particulars; hence, as we have said, there is no corroboration what-

ever of Scott's testimony upon the important question—was Curley lying on the track, and, if so, in such a position that he could and should have been seen by the engineer in time for him to have averted the accident. Curley, it will be remembered, did not join in the drinking and gambling until after he was through with his work on Saturday night, whereas Scott had been so engaged all day Saturday, and continued after Curley joined the party. It seems reasonable to suppose, then, that Curley was as well able to walk home as was Scott to get on the drawhead while the locomotive was in motion and ride on it to Cheneyville. And, whereas Curley said he intended to go home and was last seen actually walking in that direction, no one has testified that Scott was actually seen on the drawhead. In addition to other matters affecting Scott's credibility, we must consider his statement to the effect that, situated as he was, and as he says Curley was, he could have seen Curley at a distance of a mile, a statement which, in view of the other testimony in the record, it may safely be said was untrue. And if he was no more truthful in what he testified that he did see than in what he testified that he could have seen, he is utterly unworthy of belief. Finally, it is fairly inferable from the testimony that Curley knew that trains were frequently passing on the track upon which he chose to walk; for he was section foreman of a logging road at Meeker, and was in the habit of traveling frequently between Meeker and Lecompte. He knew that defendant's right of way was fenced and posted and that there was a good country road which ran parallel to it; and when he started home the woman whom he left at Lecompte warned him that he had better take that road. It was therefore negligent in him to walk on the railroad, and more negligent for him to lie down on it, if he did so. In such case, while we have held that a

right of recovery may exist in the event of the killing by a train of a person so lying down, we are of opinion that the evidence in support of the action should be clear and satisfactory, to the effect that, by the exercise of ordinary diligence by the person in charge of the train, the peril of the other might have been discovered and the killing avoided.

For the reasons assigned, we conclude that the evidence adduced by plaintiff is not of that character. It is therefore ordered that the judgment appealed from be annulled, and that there now be judgment in favor of defendant rejecting plaintiff's demand and dismissing this suit, at her cost in both courts.

SOMMERVILLE, J., takes no part.