**EDWARDS et ux. v. TEXAS & P. RY. CO.***

No. 1909.

Court of Appeal of Louisiana.
First Circuit.

Dec. 19, 1938.

Frank Peterman, of Alexandria, for appellant.

Coco & Coco, of Ville Platte, for appellees.

*Rehearing denied 186 So. 367.

OTT, Judge.

The body of Austin Edwards, the twenty year old son of the plaintiffs, was found between the rails of the defendant railroad company's track on the morning of October 19, 1937, a short distance above the station of Point Blue, in Evangeline Parish. The face and the upper part of the body were badly mashed and crushed, and the right arm was missing. This suit is by the parents of the deceased to recover damages for his death in the sum of ten thousand dollars.

The case is here on an appeal taken by the defendant from a judgment against it in favor of the plaintiffs for the sum of $3,000. The plaintiffs have answered the appeal and ask that the judgment be amended by increasing the amount of the award to the sum of $10,000.

The charge is made that the mixed freight and passenger train of the defendant railroad ran over and killed the deceased as the train was making its regular run from Eunice to Bunkie the night previous, and while the deceased was lying on the track unconscious from over indulgence in alcoholic liquors, or as the result of an epileptic spell to which the deceased was at times subject. The operators of the train are charged with negligence in failing to keep a proper lookout, and in failing to see the deceased lying on the track in a helpless and unconscious condition, and in their failure to stop the train.

The railroad denies that it was guilty of any negligence, and denies that the deceased was run over and killed by its train while he was lying on its track. The pleadings and the evidence in the case have narrowed the issues down to one question of fact; i. e., whether or not the deceased was run over and killed by the train while lying in an unconscious condition between the rails.

It is shown that the train was going only fifteen miles per hour and that the track is straight at the point where the body of the deceased was found; that there are no obstructions on the track at that point to prevent the operators of the train from seeing an object as large as a human being on the track at night as far as 800 or 900 feet; that if the deceased was lying on the track, between the rails, he could have been seen in ample time to stop the train. It therefore follows that there is no question in this case of the inability of the engineer to stop the train after seeing the deceased on the track, but the question is, was the deceased lying on the track in an unconscious condition and was he run over by the train and killed while in that position? If this question is answered in the affirmative, the negligence of the defendant is practically admitted, or at least follows as the only reasonable conclusion.

No one actually saw this unfortunate young man lying on the track, nor did any one see the train run over him. The proof of the disputed fact insofar as plaintiffs are concerned must rest on circumstantial evidence and established physical facts. A brief summary of the circumstances and the physical facts is necessary to a proper analysis and understanding of the evidence.

The deceased lived with his parents, colored tenants, a few hundred yards northwest of the station at Point Blue, on the west side of the track. He had been away from home for some two weeks working in the rice fields of southwest Louisiana and was on his way home to spend the night with his parents. He and a companion, Ford Fontenot, alighted from a truck a short distance below the depot at Point Blue between 8 and 9 o'clock on the night before the dead body was found. The deceased had been drinking most of the afternoon, and he was considerably under the influence of liquor when he reached Point Blue, but he could walk and was able to talk coherently. His companion, Fontenot, asked the deceased to go home with him, but he refused and told Fontenot that he was going to the home of his parents. The deceased and Fontenot parted company while the deceased was walking on the railroad track toward his home, Fontenot turning off to the right in order to go to his home located some four or five hundred feet north of the depot on the east side of the railroad. The point where the two separated is not far from the place where the body of the young man was found the next morning.

A resident of Point Blue who lives some 75 feet west of the depot, and some 150 yards from the place where the deceased is supposed to have been struck, testified that the deceased came to his home about nine o'clock that night asking if his parents still lived at the same place (it appearing that they were talking of moving to another place), and the witness told the deceased that his parents were still living

at the same place, several hundred yards north of the station and on the west side of the railroad. The witness says that the deceased was noticeably under the influence of liquor. The deceased left the home of this witness walking up the railroad track toward the home of his parents, and the witness watched him until he went some two hundred feet up the track. This witness and Fontenot were the last to see the deceased alive.

The next morning the body of the young man was found lying between the rails of the track some 300 yards north of the station. About 100 yards north of the depot there is a switch track, known as the gin switch, and at a point near this gin switch, between the rails on the main track, a bundle of clothes, a hat and a piece of cocoanut were found. The bundle of clothes and the hat were shown to have been in possession of the deceased when he was last seen. The clothes were in a flour sack, and, according to the testimony, the bundle was some 10 or 12 inches high when lying on the ground. Neither the bundle nor the hat appeared to have been struck or mashed by the train. The body was found about 185 yards further north from the place where these articles were found. A piece of cocoanut was found near the hat and the bundle.

At the point where the clothes, hat and piece of cocoanut were found there is little dirt between the rails on top of the cross-ties, but a few steps further north the ties are fairly well covered with dirt forming a kind of crown in the center midway between the rails and tapering off on both sides down to the rails, so that there is very little dirt on the ties near the rails. At the point where this crown or rise begins there were dents or broken places in the dirt toward the left rail, and these signs continued at intervals up to the place where the body was lying. Some of the witnesses describe these dents as having the appearance of the print of a heel in the dirt. The body was lying near the left rail between the rails where these dents in the dirt stopped. The body was lying parallel with the track, the head toward the north and the face up. There was considerable blood on the track near the body, and some of the witnesses state that there were signs of blood back to the switch, but there is a conflict in the testimony on this point.

The clothes worn by the deceased were badly torn and cut up, so much so that some of the witnesses said the deceased had been dragged. There were also pieces of cocoanut near the body and also broken pieces in the pocket of the clothes worn by the deceased. The face and chest of the deceased were crushed and mashed almost to a pulp, and the right arm was entirely off and was not found.

There is a space of about eight inches from the top of the ties to the pilot of the engine, so that a man weighing 125 to 135 pounds lying on the ties between the rails would hardly escape being caught by the pilot of the engine. His face and chest being the highest parts of his body would be struck first and crushed the most. There are many conceivable ways in which a person so lying on the track could be pushed or dragged along for 185 yards before the wheels would roll over the body.

There was only one train that passed from the time the deceased was last seen until his body was found the next morning. This train passed Point Blue going north just after midnight. The train consisted of the engine, tender, two box cars, two coal cars, a tank car and passenger coach. None of the train crew knew that a man had been killed until the next day when they made the return trip to Bunkie.

The engineer, the fireman and the head brakeman testified that they were in their respective places as the train passed Point Blue—the engineer in his cab on the right side, the fireman in his cab on the left, and the head brakeman just to the rear of the fireman. All three testified that they were looking ahead along the track; that they could see 800 to 900 feet up the track, and could have seen a rabbit on the track for that distance; that they were giving particular attention at this point in order to make sure that the unlighted gin switch was not open; that there was no one lying on or near the track as they passed over this point, and the train did not run over anyone lying on the track.

An engine foreman inspected the engine at Bunkie the next morning in the usual manner, and he did not see any signs of blood, torn clothes or other evidence of the engine striking an object, although he was not looking for any signs. An engine watchman who had heard about a man being killed, examined the engine at Eunice the next day for signs of blood, clothes,

etc., but found no such signs on any part of the engine.

■ We are convinced, as was the trial judge, that the deceased was killed by the train. The fact that the bundle of clothes carried by the deceased, his hat and a piece of the cocoanut which he had in his pocket, were found between the rails near the switch track can be accounted for under no other theory than that the deceased was on the track at that point. The further fact that the cocoanut was broken, and other parts found near his body and in the pocket of his overalls indicates conclusively that he was struck with a violent blow by something on the track, and the fact that his face and chest, the highest parts of his body when lying down, were crushed and mangled, goes to show that he was run over while lying down between the rails, and his body dragged some distance before being caught in the wheels. The dragging, rolling or pushing of his body along the track near the left rail is indicated by the dents and torn places in the ground beginning where the crown or rise in the center of the track reduced the space between the pilot and the ground, causing the body to be crushed and pushed toward the left rail where the space was sufficiently large to permit the body to be rolled or dragged under the engine.

If the body had been found outside the rails, alongside the track, and had there been no bundle of clothes, hat and pieces of cocoanut found in the middle of the rails, and no signs of parts of the body having struck the ground between the rails from the point where these articles were found to the body, we might indulge the theory advanced by the defendant that the deceased was trying to steal a ride and fell or was caught under the wheels of the train, in which case the defendant manifestly would not be liable. But if he was stealing a ride, we cannot see how his hat, bundle of clothes and piece of cocoanut got in the middle of the track, nor do we see how he could have gotten under the cars in such a way as to be dragged 185 yards between the rails, and then his face and chest mashed down and crushed and his clothes torn to shreds.

■ We are not unmindful of the rule that in order to hold a railroad liable for running over trespassers lying asleep or drunk on the track the evidence of negligence on the part of those operating the train should be certain and convincing, which rule has been followed in numerous cases, some of which are cited by defendant, the most appropriate being the case of Brooks v. Texas and Pacific Ry. Co., 141 La. 809, 75 So. 731. But an examination of these cases will show, as in the Brooks Case, that the certainty required in the proof related principally to the question of whether or not the engineer saw, or should have seen the person lying on the track in time to stop the train. Here the question is not whether the engineer could have prevented the accident by stopping the train, but the question is whether or not the deceased was run over by the train while lying on the track. This fact must be proved with that same degree of certainty as any other material fact on which a cause of action is based.

In reaching the conclusion that we have it is not necessary for us to pass on the credibility of the three men who were operating the train and testified that the deceased was not on the track nor run over by the train, nor do we deem it necessary to explain their testimony through interest, mistake, or wilful misstatement. We cannot help but give weight to the mute evidences of the occurrence disclosed by the physical facts and the circumstances surrounding the tragic death of the misguided and unfortunate young negro man. No interest, bias or willfulness can influence the laws of nature nor change the ordinary sequence of circumstantial facts.

■■ The deceased was almost of age, and it is not to be presumed that his parents could have expected much further help from him in the way of support. No claim is made for pain and suffering sustained by the deceased as he was killed instantly. Under the circumstances we think the award of $3,000 allowed by the trial judge to both parents is sufficient, and in line with the award in other similar cases. Le Blanc and Wife v. Sweet et al., 107 La. 355, 31 So. 766, 90 Am.St.Rep. 303; Roberts v. Louisiana Ry. & Nav. Company, 132 La. 446, 61 So. 522, Ann. Cas.1914D, 1207; Chanson v. Morgan's L. &. T. R. R. & S. S. Co. et al., 18 La.App. 602, 136 So. 647; Miller v. Baldwin et al., La.App., 178 So. 717; Williams v. Brown et al., La.App., 181 So. 679.

For the reasons assigned, the judgment is affirmed at the cost of the appellant.