I concur in the result because I think the so-called moratorium judgment was, under the circumstances here shown to exist, tantamount to and has the effect of a written contract entered into by plaintiff and defendant.

## SHAMBURG v. THOMPSON.

### No. 1932.

Court of Appeal of Louisiana. First Circuit.

Feb. 15, 1939.

Frank E. Powell, of DeRidder, for appellant.

Odom & Prejean, of Baton Rouge, for appellee.

LeBLANC, Judge.

On the morning of August 4th, 1937, at about nine o'clock, Henry Davidson, a young negro twenty-two years of age, was run over by a freight train of the New Orleans-Texas and Mexico Railroad Company in the town of De Quincy, in Calcasieu Parish. He sustained severe injuries to both legs, necessitating an emergency operation but from which he died however at 2:30 o'clock of the afternoon of the same day.

His mother, Agnes Shamburg, alleging that she has a cause of action in her own right growing out of the accident and death of her son, and that she has inherited his cause of action for the pain and suffering which he endured from the time he was injured until his death, has instituted this suit to recover damages in the total sum of $15,000 against the Railroad Company, through Guy A. Thompson, Trustee, who was operating the same under orders of Court at the time of the accident and is still doing so.

She alleges that Carl Davidson, who was her son's father, had died some two years before this suit was filed, which was therefore prior to her son's accident and death.

In her petition plaintiff alleges that on the date of the accident defendant was operating its train No. 62, consisting of seventy-three mixed freight cars on its railroad from the town of De Quincy to the station of Anchorage in the Parish of West Baton Rouge. That the said train left the depot

in De Quincy at about 8:45 in the morning. She avers that about 8:55 o'clock, her son, who had been walking in a westerly direction on a sidewalk paralleling the railroad on the south, left the said sidewalk at a point about 2200 feet east from the depot, crossed the street and entered a well beaten pathway which runs diagonally in a northwesterly direction, as he was on his way to keep an appointment with someone on the north side of the railroad tracks. She alleges further that it was necessary for him to go on the right of way of the railroad company and to cross its main track in order to reach his destination, and that accordingly he did enter upon its property and as he approached the tracks, the train referred to was passing that point, going at a speed of approximately eight or ten miles per hour. She avers that her son stopped at a point at least five feet south of and away from the track to await the passing of the train, where it was entirely safe for him to be, had the train been properly inspected, equipped and operated, but that while so standing he was suddenly and violently thrown down under the wheels of the train and both his legs were severed. On information and belief she alleges that one of the cars of the train had a long steel wire about sixteen feet long attached to or dangling from it, and that it was this wire which caught her son and dragged and hurled him under the wheels of the moving train as aforesaid. She charges gross negligence against the defendant, its agents, servants and employees in failing to have made careful and proper inspection of the train and especially in permitting it to be operated with a wire or cable attached to it or dangling from its side.

She alleges that her son, who was unmarried, lived and boarded with her and contributed regularly to her support. For the loss of such support she asks $5,000; for the pain and suffering endured by him which gave him a cause of action which she inherited she demands $3,000 and for the deprivation of his companionship $7,000.

The defendant for answer admits that it was operating its train No. 62 on the date as alleged and that plaintiff's son sustained injuries in an accident when he fell under the train, from the effects of which he died the same day. It especially denies however that there was any wire attached to or dangling from the train which could have caught plaintiff's son and dragged him under the train in the manner set out in her petition. It avers that on the contrary he was

attempting to board the said train and that his injuries and death were caused solely by his own negligence in that respect. It denies the negligence charged in its failure of inspection of its train and specifically avers that before it left the station at De Quincy that train was carefully inspected and there were no steel wires or cables dangling on either side of it.

In the alternative, defendant pleads that even if it be found that there was such a wire as described in the plaintiff's petition attached to or dangling from the train and in which plaintiff's son became entangled, that her said son was guilty of contributory negligence as he could have seen the same before it reached him had he been exercising due care and could then have avoided the same. It is alleged that he was further negligent in standing as near as five feet to a long train in motion and in failing to see the alleged dangling wire, all of which negligence continued to the moment of the accident and was the proximate cause thereof, and plaintiff is consequently barred from recovery.

On these pleadings the case was heard and after trial and submission the district judge rendered judgment in favor of the plaintiff in the sum of $3,200, whereupon the defendant appealed. Plaintiff has answered the appeal, praying for an amendment of the judgment by increasing the amount of the award to the sum of $8,500.

It is properly stated in briefs of counsel on both sides that the vital point which has to be determined in the first place is whether or not there was a wire dangling or protruding from the side of the train in which plaintiff's son did become entangled and by which he was dragged under the wheels of the train. Obviously if there was no such wire to hurl and drag him under the train as alleged, plaintiff has failed to establish her charge of negligence against the defendant and the contention that he was injured by falling when he attempted to board the moving train, as set out in its answer, must be given great weight and consideration.

Counsel for defendant attack the plaintiff's theory about the wire as a whimsical story with no reputable or reliable testimony to support it. The district judge however accepted the testimony on this point and there is where, counsel urge, he committed such manifest error that his finding is not entitled to the usual presumption which attaches to the judgment of the trial Court.

The only witness who claims to have seen the wire and who saw the same come in contact with the deceased, and afterwards saw him trying to extricate himself as he was moving along with the train, is a negro named Lige Simpson. This witness lives on the south side of the railroad track, the side on which the boy was standing; about fifty-five steps from the point where the accident happened. He states that he was sitting in a chair on his front porch facing the railroad and could plainly see the boy standing near the track. He was not facing the place where the accident happened directly, but diagonally. When asked to describe what he saw happen, he answers: "When I saw him he was going just this way, and I looked and I saw him going and a piece of wire had him. He was fighting the wire trying to get aloose from it. He got about seven steps and he fell. He got loose from the wire and fell back this way with his head from the track." Asked further if he saw the wire around him at the time, he says: "Yes sir, when I noticed him the wire had him and he was fighting the wire trying to get it off, just like this, (with motions of both hands over his head) and the wire finally tripped him." The witness withstood a rather severe cross-examination in which he did not waver in his account of what he had seen. In brief of counsel before this Court, his testimony is assailed as being wholly unworthy of belief, because, it is urged, it has been impeached in almost every particular. It is true that certain witnesses, if it is their testimony which is to be accepted in preference, might be said to have impeached his, but it developed that these impeaching witnesses were themselves later impeached by others. Indeed, for a great part it would seem as though the case was a proceeding in which one witness took the stand merely to be followed later on by another witness who was to discredit him.

One of the witnesses who is said to have impeached Simpson's testimony is another negro named Walter Beard. This witness, it is shown, was also sitting on Simpson's front porch reading a newspaper. He was attracted to the accident by the shouting of some woman who is said to have been the first to reach the scene. He says that he stood up at once and from where he was he could not see the place where the boy was hurt on the track because a crepe myrtle tree stood in front of him. He testifies that because of this obstruction and also a pile of crossties stacked along the track, it was impossible for Lige Simpson to have seen

the boy also. The witness however, in detailing what he did after the accident took place, says that he followed Lige Simpson to the scene, was the third person to get there, and then hurried back to his home to get something to bandage the boys' legs to keep him from bleeding. This testimony might well have served the purpose of impeaching the witness Lige Simpson on the important point whether he actually saw the boy entangled in the wire or not had the matter rested there. But on rebuttal, plaintiff produced another witness who swore that Walter Beard never did go to the scene of the accident and told her that he did not care to go. Besides, this witness and another testified that from the place at which Lige Simpson was sitting on his porch the myrtle tree did not interfere with his vision of the spot where the accident occurred and the second of these witnesses testified that the crossties referred to by Beard were not stacked there at that time but were only placed there subsequently. We might relate several other instances of the same kind regarding the impeachment and reimpeachment of numerous other witnesses on other points in the testimony, all of which like the one stated would show the difficulty in the task of deciding which witness spoke the truth and which did not. It is in a case of this kind that the rule under which the finding of the trial judge on questions of fact is accorded such great weight on appeal, is peculiarly applicable. He is in a better position either by some form of acquaintance with the witnesses or his observation of their demeanor on the witness stand to judge of their veracity and appraise their testimony as a whole.

But the district judge did not rely altogether on the testimony of Lige Simpson in reaching the conclusion that there was a wire protruding from the train in which the deceased became entangled and was drawn under the wheels of the train. He found positive corroboration in the general report which almost immediately followed the accident that the deceased claimed to have been caught in a wire.

Besides Lige Simpson, who was one of the first to go to the side of the injured boy, another witness, Lee Stevens, who reached him just as soon as the train had passed by, testified that the boy stated at that moment that he had been caught by a wire. The statements were admitted by the trial judge as part of the res gestae. True it is that other witnesses who also came to the scene almost simultaneously testified

that they did not hear the deceased make any such statement but their testimony is more or less of a negative character and in the light of the surrounding circumstances must give way to the positive testimony of those witnesses who say that he did make the statement.

It appears that within one-half hour after the accident, and while the boy was in the hospital, the defendants' agents began to make an investigation and the report about the wire had already become so prevalent that it was used as the basis of their inquiry. They even telegraphed their station agent at Basile to have the train examined when it reached that point to see if any wires might be protruding from the side of any of the cars, and this in spite of their insistence that their thorough inspection of the whole train before it left De Quincy convinced them that there were no such wires. Manifestly, the report about the accident having been caused by a wire could not have emanated without some foundation and unless we believe that it came from what the witnesses said they had actually seen and heard, we have to believe that within the space of a few short minutes only, after he had had his legs cut off and almost in the face of impending death, this injured boy would have connived with those witnesses, who are shown not to be related to him, to lay the background for a law suit against the defendant. As aptly stated by the district judge, it is inconceivable that a conspiracy to defraud the defendant railroad company would have been formed at that moment and under the circumstances then existing.

But, it is urged further, there could have been no wire protruding from the train because a careful and thorough inspection had been made before it left the station at De Quincy and none were found then. With all due deference to the witnesses who testified as having made that inspection, we believe that their own testimony shows that they were far more concerned with seeing to it that the air couplings and brakes were in good working order, and their examination of the outside of the cars, if any, was more or less casual. In view of our finding that there was a wire, we feel, as did the trial judge, that these witnesses who testified that they made the inspection simply overlooked it and this in itself is sufficient to constitute negligence on their part.

Not that it felt that it had any duty in that respect, but in order to assist the Court in ascertaining how the accident did occur, defendant produced witnesses to support its theory that the boy was injured as he attempted to board the train. The testimony of the two witnesses who say that they saw him attempt to get on and fall under the wheels of the train is, in our opinion, the weakest of all the evidence in the case. One of these in particular, the district judge found to be wholly unworthy of belief. Besides, no motive whatever for decedent's boarding the train was shown. Counsel have presented an argument on this theory which is based entirely on the testimony of the witnesses referred to and otherwise on pure conjecture.

The plea of contributory negligence has not, in our opinion, been sustained. The decedent had no way of knowing or anticipating that there was a wire attached to or dangling from the side of the train, and from its description it was not such an object as would be readily perceptible to a person standing near a moving train.

It is also contended that when the deceased left the footpath on which he approached the track from the street and entered on a point a few feet to the side, his status changed from that of a licensee to that of a trespasser to whom defendant owed no other duty than not to wantonly cause him injury. It is shown that there are several footpaths used by the people of this neighborhood which is thickly populated, as a crossing over the defendant company's right of way. The defendant had knowledge that their right of way is generally used for that purpose and we are of the opinion that it would require the drawing of too fine a distinction to hold, as a matter of law, that when the decedent stepped out of the path he was on, a few feet to the side, he changed his status from one class to another.

On the question of quantum we are asked by plaintiff in her answer to the appeal to increase the amount. We believe however that the award as made in the lower Court is in line with those made in cases of this character and we are not disposed to disturb it. See Miller v. Baldwin et al., La. App., 178 So. 717, and the recent case of Edwards v. Texas & Pacific Railroad Company, La.App., 185 So. 111, in which numerous others are cited.

Judgment affirmed.