## YOUNG et al. v. BROUSSARD et al.

### No. 1980.

Court of Appeal of Louisiana.
First Circuit.

June 6, 1939.

478

D. Cameron Murchison, of Alexandria, for appellants.

Jacob S. Landry, of New Iberia, for appellees.

OTT, Judge.

On January 3, 1938, Pentard Young, a colored man about 29 years old, was shot by the defendant, Edmond Broussard, while he was acting within the scope of his employment as a watchman for the other defendant, the Iberia Sugar Co-operative, Inc. The negro man died from the effect of the gunshot two days later. His parents have filed this joint suit to recover damages against both defendants, in solido, for the sum of fifteen thousand dollars, and in the alternative, and in case it is found that the defendants are not liable to them in tort for the death of their son, that they be awarded compensation as dependent parents for 300 weeks at $9.10 per week, being 65 per cent of the weekly wage that said deceased was earn-ing as an employee of the Sugar Coopera-tive.

An exception of no cause or right of action was filed by defendant, Broussard, to the alternative demand for compensa-tion, which exception, by consent, was sustained. So the suit is one against both defendants for damages in tort, with an alternative demand against the Sugar Co-operative for compensation as the em-ployer of the deceased. After a trial, a judgment was rendered against plaintiffs rejecting both their demands for damages and their claim for compensation. The case is here on an appeal by plaintiffs.

The claim for compensation is not seriously urged in this court—in fact it would appear to be abandoned except as a brittle straw upon which to hang a last hope Nor do we think that this claim has sufficient merit to require any extended discussion of it. Suffice it to say that, while the deceased was an employee of the Sugar Cooperative, he was laid off

at noon on January 3, 1938, and he was shot about seven o'clock P. M. on the same day, more than seven hours after his work had ceased. While he was shot on the premises of his employer, he was not on the premises of his employer by its invitation and permission, nor was he there to do any kind of work for his employer or to prepare for beginning work. Under these circumstances, it is obvious that his injury and death did not occur in the course of his employment nor arise out of it.

The demands of plaintiffs must stand or fall on their claim for damages for what they claim was the unlawful or at least the unjustified killing of their son by the watchman while illegally performing his functions in that capacity. As there is some variance in the evidence from the allegations in both the petition of the plaintiffs and the answers of the defendants, we believe it will be more conducive to clarity to give a summary of the evidence on the disputed and vital points in the case, rather than attempt to state the issue raised by the pleadings.

There seems to be little, if any, dispute as to the following facts: The deceased was a lawful son of plaintiffs and was unmarried; he began work for the Sugar Cooperative about the middle of December 1937, and worked for it in and around the sugar factory more or less regularly up to noon of January 3, 1938, when he, together with most of the other employees, was laid off on account of a shortage of cane. Broussard, the watchman, came on duty at six o'clock that day and began his customary rounds in punching the time clock at certain intervals.

Just after the watchman started on his rounds, he ran across the deceased asleep on some sacks in the turbine room. Two other employees were present, and one of them caught deceased by the arm and led him out a side door, and the watchman told him not to come back as the men were not allowed in the mill when it was not running. The watchman testified that the deceased did not say anything, but the colored employee who led him to the side door and another employee who was present testified that the deceased said he was sick. All three of these witnesses who were present when the deceased was put out the first time testified that the deceased had been drinking and appeared to be drunk. But none of these witnesses testified that the deceased gave any resistance or showed any aggression whatever.

It is no doubt true that this colored man was sick from the effect of indulging in intoxicating liquor, and he was seeking a place to sleep off the effects of his over indulgence. In his condition of half stupor, he could not have been considered a dangerous person, in fact, the action of the watchman and these other two men in dealing with him as they did on this first occasion indicates that they considered him harmless and nothing more than an intruding nuisance. The evidence shows that some of the employees would hang around the factory when they were off from work. It is clear that while the deceased was a trespasser on the factory property, yet he was not there as a thief or a robber, and the watchman well knew that fact.

A few minutes after this incident, as the watchman was making his rounds, he came across the deceased coming in the sugar room of the factory. The watchman walked up to him and said "Listen, I warned you once not to be in here when the mill is shut down." The watchman let the deceased out and closed the door. No resistance was made by the deceased, the only thing that he did, according to the watchman, was to look at the watchman "kind-a-hard."

Several minutes after this second incident, that is about seven o'clock, the watchman says he met the deceased again on the floor of the turbine room; that he stepped up to the deceased, caught him by the arm and told him that he had been warned twice to stay out of the factory; that he told the deceased to get out at once, whereupon the deceased grabbed a sack of lime while the watchman was holding him. The watchman then turned loose deceased's arm and put his hands in front of his face; that he stopped the sack with his hands and tried to back up but he could not do so as he was between two pipes; that when the sack of lime burst against his hands, he (the watchman) pulled his gun and hit the negro on the head with the gun, causing the latter to stagger; that the negro reached for another sack of lime, whereupon the watchman told him to get out and accompanied his command with a kick; that the negro went out the back door, and the watchman told him not to come back as

it would be too bad for him if he did, after which the watchman closed the door.

There is a little discrepancy in another part of the watchman's testimony and that summarized above, as well as the testimony of another witness who claims to have seen this third incident. However, for the purposes of the case, we do not think these differences are important. The worst that could be said of the attitude of the deceased at this time is that he then showed a more belligerent disposition than on the two previous occasions. What the justification would have been had the watchman used greater force, even to firing at the intruder, while the watchman was backed up against the pipes and warding off the forty pound sack of lime, is not now for us to decide. The only part this incident has in the case is its effect on what happened a few moments later.

After the negro had been put out this third time and the door closed behind him the watchman, according to his own testimony, had taken about twenty steps back into the building from the door. The negro was then on the outside, and it is obvious that the watchman was then in no immediate danger. He says he heard a cracking on the outside, turned around and looked at the door and saw a shadow. As the vital part of the testimony concerns what happened immediately after the above related incidents, we will quote from the watchman's own testimony after he heard the noise and walked back to the door:

"Q. Now, did you see anything after you got to the door? A. After I got to the door, I grabbed the door and slid it wide open; after I opened the door wide open, I stepped out right between the rails and I seen a man on this side (witness marks with 'M' where he saw the man). So I got out and I got between the two rails, with my hand on my gun; I wanted to see what he was doing. Then, when he saw me, he turned around and started coming to me with his hand in his pocket, and, when I saw that I hollered 'hands up' but he kept coming, so I braced up and pulled my gun up with my finger on the trigger, and when he got about fifteen steps from me, he was still coming, so I fired.

"Q. Now, at the moment that you fired your gun, where were you standing? Mark the spot with a 'B' on this map."

The witness then marked a spot on the map as requested, and we have estimated the distance from the scale on the map from the point 'M' where the deceased was standing to the point 'B' where the watchman says he was standing as slightly over fifty feet. The watchman further stated that the deceased made three or four steps toward him before the shot was fired; that the deceased was almost running, but that he did not see anything in his hand. When asked why he shot the deceased, the watchman replied that he was a powerful man and a dangerous man, according to his (the watchman's understanding); that he shot the deceased to protect his own life and the mill property.

According to the watchman's own statement, he was 45 feet or more from the deceased when he shot him. The watchman was on the outside of the factory on the spur track which runs between the main factory and the warehouse. The watchman had just had three encounters with the deceased, and knew that the drunken negro did not show any indication of having or using a dangerous weapon. The situation then was, at least as to the watchman, that a drunken, unarmed man was approaching him from a distance of more than forty five feet, with nothing in his hands to show that the negro intended to do the watchman any serious harm.

Conceding, however, that a person might be justified under certain circumstances in firing on another person approaching him in a threatening manner at that distance, there is another circumstance in this case that considerably weakens the version given by the watchman of the fatal shooting. The undisputed evidence is that the bullet that caused the death of the negro entered his body between the left shoulder and neck, penetrated the spine and lodged in the front part of the right shoulder. In other words, the shot entered from the back or lower part of the left shoulder and took a diagonal course toward the front of the right shoulder. The deceased at the time the shot entered his body must have been turned more from the watchman than toward him, otherwise the shot could not have penetrated the body as it did. On being asked to explain why he shot the deceased almost in the back, the watchman said that the deceased tried to turn when he (the watchman) pulled out his gun; that the deceased kind of twisted

around when he pulled his gun. If this is true, we can hardly see why it appeared necessary from a distance of more than forty five feet to fire the shot. If the deceased gave evidence of turning or twisting around when the watchman pulled his gun, that would seem to be an indication that the deceased intended to change his course, if he had started toward the watchman.

■ A corporation is liable for the acts of its officers and agents to the same extent as a natural person where the acts of such officers and agents are committed in the exercise of the functions and within the scope of their employment. The duties and functions confided to such officers and agents may be lawful when properly performed, but when they are illegally or unlawfully performed, the corporation becomes liable to the same extent as the person committing the unlawful act. Nash v. Longville Lumber Company, 146 La. 475, 83 So. 771; Matthews v. Otis Mfg. Co., 142 La. 88, 76 So. 249.

■ The owner of property, or his agent, is authorized to use reasonable force in ejecting a trespasser from his property after giving him proper warning to leave, but such force cannot exceed the necessities and circumstances of the situation, nor justify the taking of human life, unless the owner or his agent is justified in taking life in the defense and protection of his own life when the acts of the trespasser are such as to lead a reasonable person to believe that he is in imminent danger of losing his own life, or of suffering great bodily harm. American Jurisprudence, Vol. 4, pages 165, 166, §§ 70 and 71; State v. Ciaccio, 163 La. 563, 112 So. 486.

■ Defendants rely on that principle of law applied in civil actions for an unlawful assault that the aggressor, or the one who provokes the difficulty, cannot recover damages for an assault, even though the person making the assault and causing the injury was himself at fault. Lide v. Parker, 6 La.App. 648, and cases there cited.

■ While the persistence of the deceased in returning to the sugar factory doubtless was an aggravating and irritating act on his part, yet whatever provoking effect this conduct had in the way of causing the watchman to retaliate beyond strictly legal means ceased, or at least

became of no great importance, after the deceased had been put out the third time and the door closed on him. If it be conceded that the watchman was unlawfully assaulted by the deceased in the third encounter, sufficient time had elapsed and the situation had so changed that the watchman could not justify the shooting of the deceased on the outside of the building just because the deceased had unlawfully assaulted him a short time before on the inside of the building. Oakes v. H. Weil Baking Company et al., 174 La. 770, 141 So. 456.

■ After a careful consideration of the case, we have reached the conclusion that the defendants are liable. The only remaining question is the amount of damages.

■ The parents are claiming three elements of damage: Loss of love and affection, etc., and grief; loss of support, and for pain and suffering endured by their deceased son prior to his death.

The deceased lived with his parents when not working away from home. He contributed some three or four dollars per week to their support, but this was little more than his own board while he was at home. The father had an income of some eighteen dollars per month, and there are four other grown boys who help in the support of the family. The deceased lived almost two days after he was shot and suffered considerable pain during that time.

In the recent case of Edwards v. Texas & P. Ry. Co., La.App., 185 So. 111, we affirmed an award of $3000 to the parents of a twenty one year old son who was killed instantly and who contributed to the support of his parents. And in the later case of Shamburg v. Thompson, Trustee, La.App., 186 So. 616, we affirmed an award of $3200 to the mother of a twenty two year old colored boy who was injured by the train at nine o'clock in the morning and died in the afternoon of the same day. The parents of a twenty-nine year old colored boy were allowed $6000 for loss of love and affection, support, etc., and for the pain and suffering of the deceased in the case of Rousseau v. Texas & Pacific R. Co. et al., 4 La.App. 691.

We have decided to fix the award in this case at $3500, which amount we believe to be proper under the facts and circumstances of the case.

For the reasons assigned, it is ordered that the judgment appealed from be and the same is hereby annulled, avoided and reversed, and it is now ordered, adjudged and decreed that there be judgment herein in favor of the plaintiffs and against the defendants, Edmond Broussard and the Iberia Sugar Cooperative, Inc., in solido, in the sum of thirty-five hundred dollars ($3500), with legal interest thereon from judicial demand until paid, and for costs in both courts.