Statement of the Case.
MONROE, C. J.
This case comes up on appeal from a judgment rejecting a demand for damages made by the tutor of the minors, Hope, on behalf of his wards, for the killing of their father, Riley Hope, who was run over, with fatal result, by one of defendant’s trains.
It is shown that the accident occurred between 5:30 and 6:15 p. m. of Saturday, March 8, 1913; that the train involved consisted of an engine, a gondola, four flat cars, and a caboose; that it was moving westward, through the western suburb of Jeanerette, at the rate of 6 or 8 miles an hour (somewhat reduced at the moment of the collision), had passed the point at which the road crosses Nicholas street and ran over the decedent, killing him instantly, at a point between that and the next crossing, at Henkle street, which was 364 feet to the westward; that decedent was á negro laborer, industrious and of good character, but somewhat addicted to the use of intoxicating liquor and capable of carrying a good deal of it without inconvenience; that he had been working at a place, or station, called “Olivier,” and had been paid off, and that he and a fellow workman, named poleman, had gone into Jeanerette, on the 5 o’clock train, on their way to Rosetown, where they lived; that Rosetown is a negro settlement, which, as we infer, lies to the south of defendant’s track, and about a mile distant therefrom; that decedent and Coleman parted at Nicholas street (or “Minta’s crossing,” as it is otherwise known, by reason of the fact that Minta Scott, a colored woman, called as witness for plaintiff, owns and lives in a house on the southwest corner of that crossing), decedent (as we understand Coleman’s testimony) going directly south as the nearest route to his house, and Coleman continuing along the track, in order to turn south at a point farther to the westward; that it was understood between them, however, that, having reached their respective homes, they intended to return, at once to Jeanerette, though the purpose of that intention is not disclosed. Coleman testifies that they had, between them, consumed two flasks of Whisky (each containing a half pint, as we infer from other testimony), before leaving Olivier, and that decedent had afterwards,-imbibed the contents of another flask; but we find no intimation from him that, when they parted, decedent was not entirely able to take care of himself. Coleman further testifies that, when he was returning to Jeanerette, not many minutes later, he met decedent at the place where they had parted (decedent having already made the return trip to Jeanerette, and being then on his way home again); that they exchanged *547 “Hellos”; that he asked decedent “if he had anything,” to which decedent replied by opening his coat and showing a flask of whisky in the pocket; and that decedent “started off like a man drinkified.” It does not, however, appear from his testimony that decedent was unable to express himself intelligibly or preserve his equilibrium, or that his “drinkified” condition would have been apparent to the casual observer; and, it may be added, there was found upon his person, when he was killed, a few minutes later, a flask of whisky with its contents intact.
Minta Scott, as we have stated, lived at the corner of Nicholas street and the “right of way,” and her niece, Emily Blossom, lived opposite, or nearly so, on Nicholas street. They were both called as witnesses for plaintiff, and the substance of their testimony is that Emily Blossom, having occasion to go to her aunt’s house, saw the decedent walking on the track, in front of, and in the same direction as, the moving train, and in such proximity to it that she realized, to her horror, that he must Inevitably be killed; that she thereupon entered the house, through the back door, calling to her aunt, who was coming towards her from the inside, “Oh, Auntie, look! The train is going to kill the man,” after which, as she says, she was too much scared to look any more, and hence did not see the killing. She estimates the distance between the train and the man, when she saw them, at from 25 to 35 feet, or, rather, she gave her idea of the distance by referring to certain objects in or about the courtroom, and the estimating was done by the counsel in the case. She testifies that the man was walking in the middle of the track, with his hands behind his back, and was looking down; that he was walking straight; and that she knew nothing about his being drunk. She did not hear any blowing of whistle or ringing of bell on the locomotive.
Minta Scott testifies that her attention was attracted by her niece, but also that “they kept blowing and blowing and ringing the bell,” and, we think it probable, from the fact .that she was moving towards the door when her niece came in, calling to her, that she had already heard the blowing and ringing and was on her way to find the reason for it when the voice of her niece conveyed that information. Illustrating the distance between the train and the man when she saw them by referring to a bench in the courtroom, it was agreed by counsel that it was S or 10 feet. She further testifies that the man was walking in front of the train, with his hands behind his back and his head down, or that he was looking down; that he was walking straight, in the middle of the track; and that she saw no boy near him attempting to pull him off the track or otherwise; that she had known decedent since she was a child; and that she found it necessary to speak to him in a loud tone in order to make him hear.
Lawrence Green, a negro boy, who appears to have been about 13 years old at the time of the accident, testifies that he was walking on the track at a distance (estimated by counsel) of 12 feet behind decedent when the latter was killed; that, just before the train struck him, he (witness) ran and grabbed his coat and tried to pull him off the track, but that he was so drunk that he could not pull him off, and that he just had time to get off himself; that, in fact, the cowcatcher of the locomotive caught and tore, or broke, the toe of his right shoe (a new shoe), though, on the next page he says that, when he took hold of decedent’s coat, the train was as far away as the “other side of the wall” (estimated at 28 feet). He says, repeatedly, that he heard neither whistle nor bell, and did not hear the train. He also testifies that he met decedent before he got to Minta’s corner and went on the track and walked with him until he was killed; that there was no one else *549 with him; and that decedent did not stop to talk to any one; that he thought the train was coming because he heard the rails rattling, and then looked behind him; that the train was made up of box cars (not flat cars, but box cars) that they put meat and things in; that he tried to pull decedent off with one hand (his .other hand being employed in holding a shoe black box); that his left side was towards the track, but his right foot was inside the rail, while his left foot was outside on the cross-tie; and that the train was coming from the west.
The engineer, called by defendant, testifies that he saw decedent walking along on the right, and out, side of the track, on the ends of the cross-ties; that, when the locomotive was within about 60 feet of him, he stepped on the track, headed diagonally across, creating in the mind of the witness the impression that he intended to cross; that, by the time he got between the rails, the locomotive must have been within 45 or 50 feet of him; that, when he stepped on the track, witness gave the “stock,” or alarm, whistle (repeated short whistles), shut off steam, and applied the air to the brakes; that decedent, in the meanwhile, passed from the right, or engineer’s, side of the track, to the left, or fireman’s, side, and beyond the view of the witness by reason of the fact that the body of the locomotive then intervened; and that witness thought he had left the track, on the fireman’s side, and, momentarily, released the brakes, but immediately applied them again upon being informed by the fireman that decedent had not left the track on his side, the release and reapplication occupying not more than a second; that the bell was ringing continuously all the time they were passing through the town; that he did all that it was possible for him to do to avoid running over decedent.
The testimony of the engineer is corroborated by that of the fireman. Both of them testify that they saw no boy on the track, attempting to pull decedent off, or otherwise engaged, and another witness called by plaintiff, who professes to have seen a great deal from a point on the right of way some distance to the westward of Henkle street, testifies to the same effect. There is much other testimony, including the cross-examination of the engineer and fireman, with a view of showing discrepancies between their statements at the inquest by the coroner, and their testimony on the trial, and including also testimony showing that the track where the accident occurred is very much used by pedestrians, none of which, as it appears to us, affects the case as presented in the foregoing statement.
Opinion.
The evidence, we think, makes its probable that the unfortunate decedent whose death the plaintiff herein attributes to the negligence of defendant’s servant, the engineer, had imbibed sufficient intoxicants to render him, in great measure, oblivious to sights and sounds which would readily have been observed by any reasonably intelligent person, in' a normal condition; but it falls very far short of bringing a knowledge of his condition home to the engineer, or of showing that the engineer should have acquired such knowledge by reason of any opportunity that was afforded him so to do.
The learned judge a quo found as a fact that the decedent had made his last trip into Jeaneretto in order to do some marketing, and that, when killed, he was returning home with a basket, containing his purchases, on his arm, and it is quite likely that such information was developed on the trial, and we have, perhaps, overlooked the word “basket.” On the other hand, we find that he had made a purchase of meat, and started home with it, and plaintiff’s witnesses testify that he was walking with his hands behind him, looking down. So that, from either point of *551 view, there was nothing in his conduct, or carriage, to indicate that he was drunk, or that he- would so impress the engineer of a passing locomotive who was unacquainted with his habits. He could not have been very drunk when Coleman parted with him, at Minta’s crossing, on the very first occasion, or that witness would assuredly have mentioned it, and he would hardly, in such condition, have planned to return- to town and have been able to execute his plan as promptly as he did; and, though he may have appeared “drinkified,” to Coleman, on the occasion of the second meeting, it is to be remembered that Coleman had previously been drinking with him, and it does not follow that he would have presented that appearance to a person who did not know or converse with him and who had not been so engaged. Moreover, the boy, Lawrence Green, says that he was with the decedent at the time fixed by Coleman as that of the second meeting, and that no one met or conversed with him at that time. It is true that the boy testifies that the decedent staggered as he walked on the track; but, then, nearly all of the other witnesses who profess to have seen anything of the accident say that they did not see the boy about there, and it seems impossible that he should have escaped their observation if they saw the decedent and the train and the boy was, as he says, between the two, and only 12 feet behind the decedent. The boy also testifies that, though he occupied that position, immediately before the accident, he heard no whistle, no bell, and not even a sound from the train, and that his attention was attracted only by the rattling of the rails; and yet nearly all of the witnesses, plaintiffts as- well as defendant’s who were in the neighborhood, heard the alarm whistles, and some of them, the bell. Minta Scott heard the whistling in her house, and other of plaintiffs witnesses; at-a greater distance. It is true that some of the witnesses’ testify that the fireman stated, at the inquest, that the decedent staggered and was drunk; but the fireman denies that he made a statement intended to convey that meaning, and explains that what he meant was that decedent seemed to stagger as. he came into view from the fireman’s seat on the left side of the locomotive, and not that he had seen him stagger while on the engineer’s side.
[1, 2] Upon the whole, we fail to find anything in the record which would warrant the belief that the engineer should have known, or should have’ assumed, that the decedent was not in’ a condition to take care of himself. It is shown to be a matter of frequent occurrence for people, inadvertently, to step upon railroad tracks in front of moving trains, and to step off, with greater or less alacrity, at the sound of the whistle; some of them, however, remaining on the tracks until the last moment, as though for the purpose of testing the nerves of the engineers. But, although a railroad company may not be able to prevent the use of its track as an ordinary road or street, it is not therefore to be presumed that it invites or consents to such use, and it is known of all men that the ordinary road or street is much safer for pedestrian and vehicular use. Even, then, though a pedestrian may, without being a trespasser, choose the track of a railroad as his road of travel, in preference to other routes provided for pedestrians, he thereby voluntarily subjects himself to certain inevitable risks, and, in so doing, is guilty of negligence which may be, and ordinarily is, much greater than that of the engineer, who, using the road for the purpose for which it was built, fails to see him, or to determine his condition, or to stop his locomotive, in the least time or distance within which, by the most alert exercise of his faculties and of the means at his demand, the seeing, determination, or stopping would be possible.
*553 In the instant ease, the engineer was not at fault in either of the particulars mentioned. He saw the decedent in ample time to warn him not to get on the track, and he sounded his whistle, and the bell was rung at the Nicholas street crossing when the decedent was walking along the side of the track, some 50 yards ahead, and he had no reason to suppose that the warning would be unheeded. He saw him when he stepped on the track, and again blew his whistle, sounding the stock alarm in quick repetition, and, at the same time, shut off his steam and applied his brakes, and, though it was then too late to avert the accident, by stopping the train, it was not too late for the decedent to have averted it by getting off the track, and that is what the engineer, for a moment, thought he had done. Unfortunately, as it now seems certain, the decedent, having chosen a dangerous route to his home when a safe one was open to him, was as oblivious to the danger after making the choice as when making it, and no more looked and listened at the one time than the other. His neglect in that respect having been the proximate cause of the accident, its consequence cannot be visited on the defendant. Murray v. Ponch R. Co., 31 La. Ann. 490; Weeks v. N. O. & Carrollton R. Co., 32 La. Ann. 619; Barnhill v. Texas & P. R. Co., 109 La. 43, 33 South. 63; Cook v. La. & N. W. R. Co., 130 La. 917, 58 South. 767; Grace v. Kentwood & E. R. Co., 130 La. 964, 58 South. 830; Harrison v. La. Western R. Co., 132 La. 761, 61 South. 782; Chicago, etc., R. R. Co. v. Houston, 95 U. S. 697, 24 L. Ed. 542.
The judgment appealed from is therefore affirmed.
DAWKINS, J., takes no part.