Melvin Harvey Williams, a young negro man, was struck and run over by a switch engine of the Missouri Pacific Railroad Company about 3 o'clock of the morning of August 6, 1940, causing injuries from which he died three and one-half hours later.
In this action, damages resulting from the accident, injuries and alleged wrongful death are claimed by decedent's parents, Jennie Brooks and Luther Williams. *Page 659 
Those made defendants are Frank Jones, the engineer operating the locomotive, and Guy A. Thompson, trustee for the Missouri Pacific Railroad Company.
During the trial of the case, immediately after plaintiffs had introduced their evidence and rested, defense counsel moved for judgment on the record. The district court sustained the motion and dismissed the suit. On plaintiffs' appeal to this court, however, we held that such procedure was unauthorized in Louisiana; hence, the judgment was annulled and set aside and the case remanded for further proceedings according to law.6 So.2d 79.
On completion of the trial, defendants were condemned to pay in solido to the mother, Jennie Brooks, the sum of $1,000, plus funeral expenses of $142.25, and to the father, Luther Williams, $500.
From that judgment the parties cast are prosecuting this appeal. In answers filed thereto the mother asks that her award be increased to $2,742.25, and the father prays to be granted an additional amount of $1,000.
The accident occurred within the corporate limits of the City of Monroe, Louisiana, between Olive and Pine Streets. In this locality the track of the Missouri Pacific Railroad Company courses straight for several hundred feet in a north and south direction on an unopened street having the name of Congo.
The offending locomotive, driven by engineer Jones, was being backed toward the north. The night was very dark, but clear weather prevailed. With the engineer were the fireman, J.W. Musselwhite, who occupied his regular seat, and two switchmen, E.B. Hales and C.S. Moore. The last-named two persons stood on the vehicle's rear foot board, facing the direction of travel as the backward movement took place. According to all of those operators, the headlights and brakes were in first-class condition and functioned properly; a speed of from 10 to 15 miles was being experienced; a strict lookout ahead was kept; and the bell was continuously ringing.
An object, which later proved to be decedent, was observed by the engineer and by both of the switchmen when they were more than 150 feet away. The fireman was then engaged in caring for his equipment. It was noticed lying on the cross-ties outside of and next to the west rail, and appeared to them to be nothing more than a piece of paper. The engine could then have been stopped easily, because, with the speed enjoyed of 10 to 15 miles per hour, stopping was possible in a distance of 18 to 20 feet following application of the emergency brakes.
When 75 feet away, the engineer's view of the object became obstructed by the water tank tender. The eyes of both switchmen, however, continued to be focused on it; and while that distance intervened, they held a discussion as to its identity.
The locomotive was not slowed until switchman Hales ordered that such be done when approximately 20 feet away. His order was followed, momentarily thereafter, by a signal to stop. A halt was effected too late, two wheels of the tender having then passed the point and severed decedent's arm near the shoulder.
Switchman Hales states that he identified the object as a man when the locomotive was almost in the act of hitting it. Then he discovered that decedent was dressed in khaki clothes, lying motionless outside of the rail on the ties with his feet toward the engine and one knee extending just above the rail and six or eight inches above the rest of his body. After making this discovery and giving the stop signal he attempted to kick or shove the body from the ties. This effort proved unavailing.
Although an arm was cut off no portion of the man had lain on the rail, according to Hales. In accounting for the arm's loss, he said: "Well the footboard that I was riding on I think has a clearance of about eight inches above the rail; he probably raised up and the footboard turned him around and in turning him around he must have thrown his arm over the rail."
It is contended by plaintiffs that decedent was asleep or incapacitated from strong drink when struck, and in support of their contention many witnesses were offered to prove his excessive imbibing at numerous bars and night clubs during preceding hours. Defense counsel, in this regard, make the following statement in their brief: "While the proof showed that decedent was a trifling, dissolute young negro man, living apart from his parents and that he had done some drinking that night as he rambled about the low dives, gambling houses and negro joints in an outlying section of Monroe, plaintiffs' proofs ceased a couple of hours before the accident and *Page 660 
before then was unusually flimsy, contradictory, unreliable and unreasonable. For the purposes of this appeal, however, we are willing to admit that decedent was drunk and in that condition was lying asleep on the cross-ties in the position described by defendants' witnesses — the only evidence presented thereasto."
Assuming then that decedent was lying drunk and asleep on the track, as plaintiffs contend and defendants admit, it must be said that he was guilty of the grossest kind of negligence that continued until the moment of the accident; and recovery for his injuries and death is barred unless it appears that the operators of the engine had the last clear chance for averting the tragedy and did not discharge their legal duty of doing so.
In a case of this character, when deciding whether or not the doctrine of the last clear chance is applicable, it is important to determine whether the accident occurred in a sparsely settled section or in a populous area; because each of those places is governed by a different rule of law.
It is shown by the evidence in the instant controversy that at and near the spot where decedent was struck a well-defined foot path lies on each side of the track and there exists a dim one between the rails. Approximately 39 residences are located in that vicinity. A number of wine parlors, patronized by colored people, are operated on or near DeSiard Street in Monroe, Louisiana, three or four blocks away. The nature and condition of the locality was thoroughly familiar to engineer Jones and switchman Hales, both of them having traveled over the track for many years.
On this locality question, counsel for defendants, in their brief, comment as follows: "The railroad track was an industrial spur in an unimproved, unopened, undeveloped street, undoubtedly occasionally used by a few pedestrians, mostly during the day, sometimes at night and very rarely, if ever, at 3:00 A.M. — the time of this accident. As to the "`probability'" of finding anyone there then, the proofs of both sides demonstrate unlikelihood because of rare use at that hour. However, it was within municipal limits, and sincerely desiring to present the single legal issue here, uncomplicated by factual dispute, we shall concede the populous area point, as contemplated by the decisions and as distinguished from a "`rural section'".
Considering then the proven and admitted incapacity of decedent and the fact that the accident occurred in a thickly populated section of the City of Monroe with which the operators were familiar, and considering further the established fact that there existed sufficient time for the stopping of the locomotive without injury after decedent was seen, although he was not then actually recognized as being a man, we must hold, under the jurisprudence of this state, that the last clear chance for preventing the mishap was with those operators, and their failure to so prevent it constituted gross negligence which was the proximate and immediate cause of decedent's injuries and death.
The defendant in Jones v. Chicago, Rock Island Pacific Railroad Company, 162 La. 690, 111 So. 62, 64, was held liable for its train running over plaintiff's husband, at night and within the City of Ruston, Louisiana, as he lay flat on the track in a drunken condition. The engineer saw the object, and could have stopped the train when about 300 feet away. He did not discover that it was a person until a distance of 50 feet intervened; and then it was too late to avoid the mishap. Among other things, the court said: "The location of the object, the public's use of the track, the proximity of habitations thereto, if within the knowledge of the engineer, are elements in determining whether or not, under the particular circumstances shown, the engineer was negligent, and whether he could by timely action have prevented the accident. There is no fixed rule in the jurisprudence of this state determining when the engineer shall stop his train after he discovers that some object, the nature of which he does not know, is on the track, but the opinions of this court in such cases are based primarily upon the special facts of each case. When it appears that the engineer knew that a portion of the track was used by pedestrians daily, and that these pedestrians lived near the right of way of the railroad, he must exercise greater caution in the operation of his train than will be required of him under other circumstances."
Strikingly similar to the facts of the instant case are those in Shipp v. St. Louis Southwestern Railroad Company in Trusteeship, 188 So. 526, 527, decided by this court in 1939. Therein, plaintiff's husband and his brother-in-law were lying on a *Page 661 
railroad track in a drunken stupor near the business section of the Town of Plain Dealing, Louisiana, about 2:30 o'clock one morning, when run over by defendant's southbound freight train. Recovery was allowed plaintiff for her husband's death; and in the course of our opinion we said:
"There were no physical objects on the track to interfere with vision except some weeds not over eight inches high. These appear to have not been dense. Visibility that night was good. The engineer testified that when his engine was north of Mary Lee avenue (a distance of approximately 200 feet from the men) he saw on the track below the street some pieces of brown paper. What he meant to say was that he then thought the objects he observed were pieces of brown paper. The lower court inclined to the belief, and so do we, that what the engineer saw were the bodies of these two men prone upon the track. No other person saw any paper on the track. One or two testified that none was thereabout that night nor the following morning.
"Notwithstanding the locus was in a square formed by four town streets, was adjacent to the business section of the town of 1500 inhabitants, and that pedestrians by force of habit, as is the uniform custom in like places everywhere, regularly traveled thereon, all to the engineer's knowledge, he dismissed from consideration, if it occurred to him, the possibility that he could be mistaken in the identity of what he saw ahead. He closed his mind to the possibility of error on his part and drove his engine forward without stopping to make an investigation and without reducing its speed so that an accident could be averted if these objects were discovered to be human beings when he was within a few feet from them.
* * * * * * *
"We are unable to understand way the presence of these two men was not observed by the fireman and engineer in time to avoid running over them. We conclude that they should have discovered their perilous situation, before it was too late to avert the accident. It was their duty to have done so. The opportunity was present for them to do so. They had the last clear chance to do so. It was gross negligence and carelessness not to have timely seen them. Under the law, their negligence is just as culpable as it would be had they seen the men and not exhausted all means available to avoid injuring them.
"Shipp and Thomas were trespassers upon defendant's track. That they were guilty of gross negligence cannot be questioned. But their negligence was passive, inactive. It cannot reasonably be said that this negligence was a proximate cause of the accident. It was a remote cause only, — such a cause as may not, in legal contemplation, be characterized as being proximate to the accident."
The Orleans Court of Appeal, in Miller v. Baldwin, 178 So. 717, 722, followed the rule applicable to a situation, such as is here presented, where a person is struck by a train while lying on a railroad track in a populous area oblivious of danger because of sleep or intoxication, the court stating in its opinion that "much greater care is required on the part of the operators of the train, and a greater responsibility is on them to keep a lookout for persons who may reasonably be expected to use the tracks for walking thereon, and who may be expected at times to lie down thereon and become unaware of their dangerous situation."
To differentiate the case at bar from the discussed authorities, defendants point to the fact, established by the testimony of the locomotive operators, that large pieces of light brown wrapping paper similar in color to that of decedent's khaki clothes were frequently found on or about the track in the locality in question, such paper coming from numerous industries located there; and they argue that it is not the duty and obligation of the trainmen, at the peril of liability, to correctly identify every such piece lest, perchance, one of them might prove to be a drunken man.
The existence of the described waste paper condition, we think, was even more reason for the trainmen to use unusual care and caution in their operations. Especially is this true when it is considered that those persons had knowledge of the heavy pedestrian travel along the track and of the many nearby residences, and they knew that there were being conducted only three or four blocks away numerous bars and wine parlors frequented by drunks.
The condition and circumstances of that locality demanded that they make certain that the observed object on the track was *Page 662 
not a helpless human being. They were without right to proceed as they did, assuming that what they saw was merely a piece of paper. Switchman Hales and Moore were not sure that only an inanimate object lay ahead of them, because they discussed its identity when 75 feet away. With this doubt existing in their minds the locomotive should have been stopped before striking decedent, as it could have been.
The fact that plaintiffs' son lay on the outside of the rails instead of on or between them, is of no moment. In the position that he occupied he could be and was seen in ample time to permit the avoidance of the accident; and the avoidance would have been accomplished if the operators had used the great care required of them.
One of the cases cited by defense counsel in their brief is Rogers v. Louisiana Railway Navigation Company, 143 La. 58, 78 So. 237, 238, from the opinion of which they quote as follows:
"`The place where the accident occurred is about 204 feet east of the crossing of the Alexandria Western Railroad, on the outskirts east of the city of Alexandria. * * *
"`The presence of Rogers at that place is unaccounted for and will likely forever remain a mystery. Was he sick, intoxicated, or did he want to depart this life on a railroad track; no one knows. In the absence of any explanation, it must be assumed as a legal conclusion that he was guilty of gross negligence amounting to recklessness, and his widow can only recover if she can clearly show that the accident might have been avoided by the exercise of ordinary care on the part of the locomotive engineer after the danger of the situation was, or should have been, by him discovered. * * *
"`Most frequently any object on the track at nighttime looks dark, and, as stated by these engineers, if the speed of passenger trains was checked or if the trains were stopped every time dark spots appear on the track, it would be impossible to efficiently operate passenger trains.'"
The distinguishing feature between that case and the instant one is found in several sentences of the opinion, not quoted in such brief, that immediately follow the above words "on the outskirts east of the city of Alexandria." These referred to sentences are: "On one side of the track is an open field, on the other side a thicket. There are no human habitations in that neighborhood, and there are no public roads near or crossing the railroad track. In other words, it is a place where no one would reasonably expect to find any human being between 10:30 and 11 o'clock at night."
The trial judge, as before shown, awarded the mother, Jennie Brooks, the sum of $1,000, plus funeral expenses of $142.25, and the father, Luther Williams, $500. His reasons for the making of these seemingly small awards are as follows:
"The plaintiffs, who were man and wife, for sometime had been living separate and apart. In fact had so lived for a number of years, and the deceased had lived with his mother part of the time, but the testimony clearly showed that his grandmother's was where his real home was, and that she in reality had more or less raised this deceased. There is no testimony that the deceased contributed anything to the support of either the mother or the father.
"As stated above, there is no testimony that there was very much if any companionship between the deceased and his parents. Certainly very little between the deceased and his father."
The father, in our opinion, is entitled to no more than was granted him. Decedent never lived with or received attention from him, he and the mother having been continuously separated since four months prior to decedent's birth. Furthermore, the father did not even attend the last rites of his son and he paid no part of the funeral expenses.
But there was considerable companionship between decedent and the mother, Jennie Brooks, notwithstanding the fact that his real home was at his grandmother's house. For many years the mother and child lived together at that place. After the mother remarried, decedent stayed with her at times and also visited her house on numerous occasions. Because of the loss of this companionship the award in favor of Jennie Brooks, we think, should be increased by $1,000.
Therefore, the judgment is amended to the extent of granting to plaintiff Jennie Brooks said increase of $1,000 and, as amended, it is affirmed. Defendants shall pay the costs of both courts. *Page 703