Raymond L. RUTHERFORD, Appellant,

v.

ILLINOIS CENTRAL RAILROAD COMPANY, Appellee.

No. 17865.

United States Court of Appeals
Fifth Circuit.

Feb. 26, 1960.

---

John R. Brown, Circuit Judge, dissented.

C. Paul Barker, New Orleans, La., S. E. Morse, Gulfport, Miss., George M. Leppert, New Orleans, La., for appellant.

James L. Byrd, Jackson, Miss., Joseph H. Wright, John W. Freels, Chicago, Ill., Byrd, Wise & Smith, Jackson, Miss., of counsel, for appellee.

Before JONES, BROWN and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This is a tort action arising out of one of those tragic accidents when a person, walking between sets of railroad tracks or on the cinder path along the side of railroad tracks, is hit and mangled by a train, and no one, including the plaintiff, knows just how the accident happened. The case was tried in the District Court for the Southern District of Mississippi, but the accident occurred in Hammond, Louisiana, and the law of Louisiana controls our decision. The able and experienced district judge directed a verdict in favor of the railroad. We affirm.

Sometime in March 1954 Raymond Rutherford, a migratory farm worker, left his home in Alabama and went to Louisiana to work in the Tangipahoa Parish strawberry fields. The season had not fully begun, so for two or three weeks he did odd jobs for a farmer in Natalbany, about two miles north of Hammond. Rutherford went from Natalbany to Hammond several times. Sometimes he obtained a ride in an automobile and sometimes he walked down

the railroad tracks, the most direct way to go from Natalbany to Hammond.

On the afternoon of April 3, 1954, Rutherford caught a ride to Hammond. He got a haircut, ate supper, killed time with the boys, and had a few drinks of either wine or beer. There is no contention that he was intoxicated. Around eleven o'clock that night Rutherford decided that it was time to go home. It was a dark, foggy night. He chose to go through the railroad yard.

About midnight an Illinois Central conductor found Rutherford. He was mangled. His right arm was severed just above the elbow and his left arm just above the shoulder. His left leg was broken. His collar bones were crushed. Most of his ribs were broken. A large part of the rear of his left hip was sheared off.

On the night of the accident Rutherford was walking between the north main and south main tracks. He either stepped in a hole and fell into the train or he stumbled into the train or perhaps, somehow, he does not know how, the train just hit him, apparently because he was on or too near the tracks. He gave all three explanations in his testimony. The train which hit Rutherford consisted of an engine with a forty-foot tender and a caboose. It was backing north on the south main line at about fourteen miles an hour. The engine was equipped with a strong headlight that provided visibility up to 800 feet in front of the train. There was a small tank light, providing little visibility, on the tender in back of the engine.

The engineer and the fireman were in the cab of the engine. According to their testimony, both were keeping a sharp lookout. There were two switchmen in the caboose. None of the crew saw Rutherford before the accident. The engineer did not know the train had hit Rutherford until someone told him of the accident when he stopped at a coal chute, some forty car-lengths from where Rutherford's body was found.

■■ In reconstructing what probably happened, the trial judge had to rely on the testimony of the conductor who found Rutherford, the Hammond Chief of Detectives, who answered the conductor's call and helped move Rutherford's body, the engineer and crew of the train, and what little information Rutherford could remember. After Rutherford testified, the plaintiff rested his case. The railroad's motion for a directed verdict was granted,[1] the district judge holding: (1) the plaintiff "fail[ed] to show where the railroad company was negligent at all"; (2) "as a matter of law that [the plaintiff] was guilty of contributory negligence"; (3) the doctrine of last clear chance was inapplicable.

We do not see this case as one in which the district judge takes over the function of the jury to resolve factual issues. Here he obeyed the duty, imposed on him as a judge, of directing a verdict based on evidence so overwhelmingly in favor of the railroad that he would have been obliged to grant a new trial if the case had gone to the jury and had the jury awarded the plaintiff a verdict.

## I.

Rutherford argues that the railroad should expect people to walk along the tracks in their yard at night and there-

1. "In the Federal courts where the evidence in favor of one party is so overwhelming that the judge in the exercise of sound discretion would be obliged to grant a new trial if the jury rendered a verdict in favor of the other party, it is his duty to direct a verdict. The rule of practice to the effect that a mere scintilla of evidence is sufficient to require submission to the jury has never obtained in the Federal courts." White v. New York Life Ins. Co., 5 Cir., 1944, 145 F.

2d 504, 509. "If the intention is to claim generally that the Amendment (7th Amendment to the Constitution of the United States) [preserving the right of trial by jury,] deprives the federal courts of power to direct a verdict for insufficiency of evidence, the short answer is the contention has been foreclosed by repeated decisions made here consistently for nearly a century." Galloway v. United States, 1943, 319 U.S. 372, 389, 63 S.Ct. 1077, 1086, 87 L.Ed. 1458, 1470.

fore owes a high degree of care to keep a sharp lookout for such persons. The accident occurred within the corporate limits of Hammond. There was no fence or other means of keeping people out of the railroad yard. Since the railroad tracks provide the shortest way from Hammond to Natalbany, itinerant workers often used the railroad tracks to come and go from Hammond to Natalbany or to their camps located north of Hammond. The engineer and conductor both knew that the strawberry season was approaching with the usual influx of migratory strawberry workers. The conductor had seen people walking along the tracks at night. The engineer testified, however, that he seldom saw farm workers using the railroad right of way at night. Neither the conductor nor the engineer saw anyone walking on the tracks the night of the accident.

Rutherford argues also that the railroad was negligent in backing a train without having a crew member riding on the rear of the train or preceding it on foot in order to warn people walking along the tracks. He contends that the dim light on the tender in back of the engine was insufficient. The other act of negligence attributed to the railroad is the use of a road engine in the yards instead of a switch engine, which has different lights and a cow-catcher in front and back.

■ The Louisiana law of negligence governs the railroad's liability in this case. The plaintiff must prove *some* negligence on the part of the railroad; "the mere happening of an accident does not raise the presumption of negligence on the part of a railroad company". Nolan v. Illinois Central R. Co., 1919, 145 La. 483, 82 So. 590, 593.

There are two elements in this case which eliminate from our consideration many of the cases cited by the plaintiff. First, Rutherford was not in a helpless condition. There is no contention that intoxication, mental incompetency, youthfulness, deafness, or other physical infirmities lessened his awareness of the presence of the train or increased the railroad's duties in the circumstances of the case. Second, Rutherford was not injured while attempting to cross at a railroad crossing regularly used by pedestrians. He was walking along the tracks, and the accident happened in the railroad switchyards. The Louisiana Court of Appeals has stated: "There is a vast difference in the measure of duty resting upon a railroad company * * between the handling of cars at a crossing regularly used by pedestrians and on its own switch yards. * * * " Sizemore v. Yazoo & M. V. R. Co., La.App. 1935, 164 So. 648, 650.

■ A lengthy consideration of the relationship between the railroad and Rutherford is unnecessary. Conceding that Rutherford is a licensee[2] does not

2. The trial judge had doubts concerning the status of Rutherford as a trespasser or as licensee. In James v. Thompson, La.App.1948, 35 So.2d 146, 148, the court stated: "However, there is very small distinction between the two as regards the duty of the owner toward them." See also Comment, 53 Mich.La.Rev. 110 (1954) where the author suggests that the definitional approach is not necessary in order to determine if the railroad is negligent toward persons injured on its tracks. See also Note, Railroad's Duty to Unknown Trespassers, 5 La.L.Rev. 342 (1943). "In determining whether the railroad company has violated a duty owing toward a person injured on its tracks, it must be borne in mind that a

railroad track is not constructed for pedestrians; and when they use it, either as trespassers or by invitation, they use it in its character of a railroad track, and not as a sidewalk or pavement made of asphalt or concrete, for the use of pedestrians. As in the case of the owner or proprietor of premises generally, the general rule is that one who is on a railroad company's private right of way and at a point other than on a highway or at any other authorized crossing, without authority and for no purpose connected with the interests of the railroad company, has the status of a trespasser and is entitled only to the protection accorded one of that status, namely, that the railroad company owes him no duty except to re-

materially lighten Rutherford's burden. Rutherford still must prove negligence on the part of the railroad.

 The train crew did not see Rutherford. It was a dark, foggy night. Visibility was limited. The train was backing at a reasonable rate of speed. The testimony is that the engineer was keeping a sharp lookout from one side of the engine and the fireman from the other. In the circumstances of this case, considering especially that there was no regular crossing, no footpath leading to and across the tracks, no streets crossing the tracks, and the train was in the switchyards, the members of the train crew were exercising reasonable care, and cannot be considered negligent for not having seen Rutherford.

There is no statute, decision, or rule of the railroad company requiring that a man be placed on the steps of the tender or precede the tender when the engine is backing, unless the engine is pushing one or more cars. Rutherford has not drawn our attention to any cases holding that due care requires a man on the back of the tender or on foot preceding the train. Although the Louisiana Supreme Court has implied on certain occasions that a man on the steps of the tender is necessary when the engine is backing,[3] it is not negligence, under the law in Louisiana, for the railroad to fail to provide a lookout while switching cars in its own yards, unless it is at or near a crossing customarily used by the public. As the Louisiana Supreme Court said in Settoon v. Texas & P. Ry. Co., 1896, 48 La.Ann. 807, 19 So. 759:[4]

frain from wilful or wanton injury to him, or to take ordinary care not to injure him after he is discovered in a position of peril. If his injury results from ordinary negligence on the part of the railroad company before his peril is discovered he cannot recover, there being no duty of maintaining a lookout to discover his presence, * * *." 44 Am.Jur., Railroads, § 436, pp. 658, 659. "The authorities are not uniform as to what will constitute an implied invitation, and according to numerous decisions, the mere fact that a railroad company does not see fit to keep people off its track, bridges, etc., will not give them a right of way. Such passive acquiescence in the use of the track or structures, like a mere naked license or permission to pass over an estate, does not create a duty or impose on the railroad company an obligation to provide safeguards against accidents incident to such use, and it will be liable only for wilful injury or gross neglect. For example, one who chooses to walk upon a railroad track in preference to other available ways involving no danger, because the railroad track is frequently traveled by pedestrians, is a bare licensee, to whom the railroad company owes no affirmative duty of care." 44 Am.Jur., Railroads, § 437, p. 662.

3. In Willis v. Vicksburg, S. & P. Ry., 1905, 115 La. 53, 38 So. 892, the plaintiff's son was struck by a tender and engine backing up in the railway yards *near the depot in Shreveport where people got on and off the trains*. The court

held that the railroad was negligent in not having one of the two men in the engine back on the tender as a lookout. See also Hamilton v. Morgan's L. & T. R. & S. S. Co., 1890, 42 La.Ann. 824, 8 So. 586, where one of the acts of negligence on the part of the railroad was failure of the brakeman to take his position at the rear of the tender when the train was backing.

4. The railroad was changing cars to a switch track alongside the depot in White Castle, Louisiana. Settoon knew the switching was taking place. He was injured while walking along a cinder path between the switch track and the main track. The path had been cindered by the railroad so that its passengers could get on and off the trains on a dry surface. It was often used by the public because it was the shortest route from the street to a store behind the depot. The court denied recovery to the plaintiffs, stating "Plaintiffs' son chose the more dangerous (route), and he was responsible for the selection, taking the latter with all of its attendant and incidental risks." See also Jones v. Sibley, L. B. & S. R. Co., 1908, 121 La. 39, 46 So. 61, where the plaintiff was injured while walking down the main tracks of the railroad while switching was taking place. The plaintiff saw the loaded cars, unaccompanied by an engine, on the main track but failed to observe they were in motion. The main track was used by pedestrians in daylight, but not at night when switching took place. The crew's warnings to the

"It is not to be expected, however, that railroad companies will patrol and police their tracks for the purpose of warning the public of danger. The tracks are silent but potent signals of danger, and to the cautious the cinder walk would have warned of impending danger, particularly on a dark night * * *."

In Nolan v. Illinois Central R. Co., 1919, 145 La. 483, 82 So. 590, a train was backing with only the tender preceding it when it struck Nolan. The engineer was keeping a look-out on one side of the cab and the fireman on the other. Nolan contended that it was negligence to operate a train in a city or town with the tender in front of the engine. The accident occurred within the city limits of New Orleans but away from all habitation, streets, and away from the traveling public. The court said that in these circumstances the railroad was not held to the strict liability to which it should be held on the streets of a thickly populated town or city. Bryant v. Illinois Central R. Co., 1897, La.Sup., 22 So. 799, involved a set of facts similar to those in the instant case. The railroad was moving cars at night from the tracks into the yards. The locomotive backed up to couple the cars and then moved forward with them. No one saw Bryant or the accident. Bryant's body was discovered between the tender and the driving wheels of the engine. There was no light or flagman at the rear of this long train. The court denied recovery saying it was immaterial that there was no light or flag, because the decedent fell between the tender and the engine.

If an engine is pushing one or more cars it is railroad policy to have a man on foot preceding the train. Rutherford's contention that the railroad was negligent in this respect is based on his assumption that the caboose was hooked to the rear of the train and was being pushed by the engine. The record does contain conflicting testimony concerning the exact position of the caboose when Rutherford was hit. But the engineer is positive in his testimony that the caboose was hooked to the head of the engine and that he was not pushing any cars in his backward movement. After passing the point where the accident occured, he proceeded north past the coal chute where he put the caboose on the end of the cars he was to pick up and take to Baton Rouge. He then brought the engine back south to the coal chute where a member of the crew of a north-bound train told him a man had been hit south of the coal chute. The engineer took the engine to the spot where the conductor had found Rutherford, and made a "cut" in the cars on the spur tracks so that Rutherford could be taken to a waiting ambulance. Rutherford's contention that the caboose was preceding the engine when he was struck is based on the testimony of the Chief of Detectives of Hammond, Louisiana, who investigated the accident. We think it significant that the train was returning to the scene of the accident when the Chief of Detectives first saw the train. He had no way of knowing the position of the caboose when the train hit Rutherford. He testified that he saw the caboose north of the engine and that he found a cap and some hair on the steps of the caboose. From this he assumed that the caboose preceded the engine when it was backing north and that it was the caboose which hit Rutherford.[5] This is pure speculation. The engineer, who should know, testified positively to the contrary.

The second act of negligence attributed to the railroad is that the light

plaintiff were not heard or were ignored. The Supreme Court reversed a verdict and judgment for the plaintiff and denied relief.

5. The conductor testified that a cap was found on the steps of the tender, which is a part of the locomotive. However, the conductor did not find the cap and was not at the scene when the cap was found. Assuming that the Chief of Detectives found the cap on the steps of the caboose, from which it might be inferred that it was the caboose that struck Rutherford, it does not necessarily follow that the caboose was preceding the engine when it was backing.

on the back of the tender was dim with no reflectors. The light was there for pedestrians to see it, not to furnish illumination for the engineer. It is not claimed that the light was so insufficient that Rutherford would not have seen it. In the Bryant case, supra, the railroad was not negligent although there was *no light* on the rear of a long train that was backing.

There is nothing in the record to show that the railroad was negligent in using a road engine instead of a switch engine. The engineer was making up a string of cars to take to Baton Rouge. It is not shown that a switch engine is customarily used to make up cars or that a reasonable standard of due care requires that one be used. The cow catcher on a switch engine would not have prevented Rutherford's injury if, as he testified, he fell into the train.

The trial judge was correct in ruling that the railroad was not negligent.

## II.

■ Rutherford contends that the question of contributory negligence was one of fact for the jury. This Court has said:[6] "We agree with appellants that the issue of contributory negligence is ordinarily for the jury * * *." Where, however, "there is no substantial conflict in the evidence which conditions it and when, from the undisputed facts, reasonable men in the exercise of a fair judgment would be compelled to reach the same conclusion, the court may properly withdraw it from the jury. Smith v. Fidelity Mut. Ins. Co., 5 Cir., 206 F.2d 549."

Rutherford first testified that he "guessed" he heard the train. On cross-examination he testified that he heard some engines, but did not know whether it was the engine that struck him. A steam engine makes enough noise to be heard for more than a quarter of a mile. As the district judge found: (1) "With this knowledge he proceeded to walk on up the track some distance * * * [I]t was his duty, when he discovered that situation, to either turn back and go back or get off the tracks."

■ Whether Rutherford heard the engine or not, he knew that switching was taking place in the railroad yard. He owed a duty to himself to keep a reasonable lookout for trains.[7] "A railroad track is of itself a warning of danger, and a person traveling thereon is charged with the responsibility of listening and watching for approaching trains in both directions * * *." Monk v. Crowell & Spencer Lumber Co., La.App. 1936, 168 So. 360, 361. If Rutherford had been exercising ordinary care, he would have seen the light on the tender of the train; if he had been listening, he would have heard the noise of the steam engine. He chose a dangerous route late at night,[8] then added to the danger either by continuing to walk along the tracks while the train was moving or by staying too close to the tracks.

Fire burns, slick pavements are slippery, and trains come down the track with no ability to sidestep. Grown men must be held to this knowledge, if railroads are to operate.

■ Rutherford testified that he "stepped in a hole and fell into the train". Accepting this account of the accident as true, or his account that he stumbled, or that he was hit by the train, for reasons he does not know, accepting as true any of his explanations, the railroad could not have avoided the accident, even if every member of the train

---

6. Brinson v. Illinois Central Railroad Co., 5 Cir., 1957, 241 F.2d 494, 496.

7. White v. Illinois Central R. Co., 1905, 114 La. 825, 38 So. 574.

8. "Even, then, though a pedestrian may, without being a trespasser, choose the track of a railroad as his road of travel, in preference to other routes provided for pedestrians, he thereby voluntarily subjects himself to certain inevitable risks, and, in so doing, is guilty of negligence which may be, and ordinarily is, much greater than that of the engineer, who, using the road for the purpose for which it was built, fails to see him * * *." Fils v. Iberia, St. M. & E. R. Co., 1919, 145 La. 544, 82 So. 697, 699.

crew had seen Rutherford walking along the tracks, and even if the entire train, front and back, had been brilliantly lighted. It was Rutherford's active negligence that directly caused the accident. The engineer could assume that Rutherford would stay out of the way; he could not be expected to anticipate that Rutherford would fall into the train.

In McGlothurn v. Louisiana & A. R. Co., D.C.W.D.La.1948, 76 F.Supp. 848, 849, an eleven year old boy walking along a well-beaten path beside the railroad tracks stumbled over some bricks and fell into the train. The Court held that the railroad was not negligent even though there were no warning whistles or bells and the railroad had allowed bricks to accumulate in a path that had long been used by the public as a passage; an eleven year old boy may be contributorily negligent. The Court said: "The boy took the premises as he found them. The railroad company owed him only the duty of not injuring him, willfully, wantonly, or through active negligence."

■ Rutherford's contributory negligence in walking along the tracks, apparently in a careless manner, and his fall or stumble into the train, were the proximate cause of the accident.

### III.

Finally, Rutherford contends that the trial judge misapplied the substantive law of Louisiana on last clear chance. A number of cases are cited to support the contention that the last clear chance doctrine applies to the facts of this case.[9] We consider these cases inapplicable.[10]

■ The elements of the doctrine of last clear chance, as it has been developed and applied by the Louisiana courts, are succinctly stated in Brown v. Louisville & Nashville R. Co., D.C.E.D.La.1955, 135 F.Supp. 20, affirmed 5 Cir., 234 F.2d 204. The doctrine is composed of the following elements: (a) the plaintiff in a position of peril of which he was unaware or unable to extricate himself; (b) the defendant in a position where he actually discovered, or should have discovered, the plaintiff's peril; (c) the occurrence of the accident at such time that the defendant could have, by the exercise of reasonable care, avoided the accident. All three elements must be present before the rule may be applied.

■ In the instant case there is lacking the element of discovered or discoverable peril from which the plaintiff could not extricate himself.[11] The un-

---

9. McGuire v. Vicksburg, S. & P. R. Co., 1894, 46 La.Ann. 1543, 16 So. 457; Brown v. Chicago, R. I. & P. R. Co., La. App.1943, 14 So.2d 307; Williams v. Missouri Pac. R. Co., La.App.1942, 11 So.2d 658; Young v. Thompson, La.App.1939, 189 So. 487; Prince v. Texas & N. O. R. Co., La.App.1939, 189 So. 291; Shipp v. St. Louis Southwestern R. Co., La.App. 1939, 188 So. 526; Edwards v. Texas & P. R. Co., La.App.1938, 185 So. 111, rehearing refused, La.App., 186 So. 367.

10. In the McGuire case, the victim was either lying drunk on the tracks or fell into the train. The train was proceeding forward, and there was no excuse for the engineer not seeing the victim unless escaping steam caused by a defective engine blocked his vision. In the Brown case the plaintiff was sitting on the tracks ·in a drunken stupor. There was nothing to prevent the crew from seeing him. In the Williams case, the plaintiff was asleep or drunk on the side of the tracks.

The crew of a train backing up saw Williams but thought he was a paper sack. In the Young case the train crew saw the deceased walking down the middle of the tracks. The train crew made no attempt to stop the train when they saw him even though it was apparent that he did not hear the signals. In the Prince case the train was proceeding forward. It was a clear day and there was nothing to prevent the engineer from seeing the plaintiff walking along the tracks. Moreover, a higher decree of care was owed by the railroad for the plaintiff since a business invitee. In the Shipp case the deceased was asleep or drunk on the tracks. The engineer saw him but thought he was a paper sack. In the Edwards case the deceased was lying asleep or drunk on the tracks.

11. "However, that rule (last clear chance doctrine) does not apply when the engineer looks down the track and sees a grown person walking leisurely along.

disputed evidence is that the train crew did not discover Rutherford prior to the accident; there is insufficient evidence to show that the train crew should have seen him; there is no evidence to show that Rutherford could not have avoided the accident by stepping to one side or going to the far side of the roadbed until the train passed.

We feel compelled to affirm the judgment.

JOHN R. BROWN, Circuit Judge (dissenting).

I respectfully, but earnestly, dissent.

The Court both by what it does and what it says finds facts. While acting as a vicarious Louisiana court, it fails to heed the caveat so often sounded. This warning is that while it is true that where Erie leads, there must we go, in determining how much is Erie law, not non-Erie fact, great care must be taken to discriminate between what Louisiana judges declare to be legal principles and what they deem to be fact conclusions over which they entertain almost unlimited review. In the process the Court brushes aside a volume of evidence that the use of these tracks by itinerant strawberry pickers, or pickers-to-be, as a public wayfare was well known. In the analysis of the case, the Court then proceeds as though the presence of pedestrians was not to be anticipated. Consequently, it is not troubled by its fact finding that the engine crew was keeping a sharp lookout—although how a sharp lookout is kept by an engineer on one side, a fireman on the other, looking forward through the fog of a dark night to the leading end of the train some eighty feet away only dimly lit by a light unintended as a headlight, is equally unilluminating. It then proceeds to find the fact of how the accident happened by choosing one of the several causal descriptions set forth in the words of the plaintiff who, when asked to clarify the apparent inconsistencies, was muzzled by the amazing objection that the testimony was repetitious. Unless a party litigant must possess mental powers and memory processes more scientific and foolproof than other witnesses, one would think that just *what* version was the truth was for a jury to evaluate in terms of the ignorance or wisdom, understanding or behavior, physical or mental powers of the declarer in the light of occurrences, including severe trauma, which might affect recollection or capacity to now retell. After reaching the legal conclusion, on the basis of facts found by it, that there was no liability vel non on the part of the Railroad either from lack of primary negligence or by reason of contributory negligence on the part of the plaintiff, the Court then re-circulates those findings to find some more facts cutting off discovered peril. This is all the more remarkable in view of the Louisiana "bouncing ball" theory of discovered peril which measures the Railroad's obligation not in terms of the peril which it actually discovered. Rather, it is that which a prudent engineer operating a train on a dark, foggy night through a switch yard known to be a wayfare for pedestrians whose actual presence would not be revealed by the weak light, would have had, had the engineer actually known what he could have known—that the plaintiff was on the right of way apparently oblivious to the oncoming train. The question of which party—Railroad or plaintiff—last knew (or should have known) that the other would not be able to avoid the peril involves both physical events and phenomenon and a legal standard of evaluation in terms of reasonableness. We are neither jurors nor fact finders. Nor are we railroaders, strawberry pickers or pedestrians. Where we get the prescience

He has the right to assume that such person will exercise ordinary care and prudence to protect himself from injury." Johnson v. Texas & P. Ry. Co., 1931, 16 La.App. 464, 133 So. 517, 520, rehearing refused 16 La.App. 464, 135 So. 114.

If the plaintiff is physically able to escape from the position of peril and the defendant did not actually see him the weight of authority is to deny relief. 38 Am.Jur., Negligence § 224; 44 Am.Jur., Railroads § 489.

to resolve these questions escapes me. I know only that we do not get it from the Constitution, and the Seventh Amendment is a stern .warning that we had better not try to acquire a competence by experience or experimentations. When it comes to applying the well accepted principle that appellate courts may determine that no reasonable mind could hold to the contrary, we are once again in the middle of a factual setting of controversy, uncertainty, dispute open to variable conclusions.

## I.

Under the Erie [1] doctrine a federal court in diversity cases is merely another forum interpreting and applying state law.[2] But as this Court has held, the Seventh Amendment to the United States Constitution preserving a right to jury trial applies to diversity cases the same as to others tried in federal courts.[3] To that constitutional provision, Erie is subservient. This we have stated and restated, and now as recent as Revlon, Inc. v. Buchanan, 5 Cir., 1959, 271 F.2d 795, 800. "The quantity and quality of proof necessary to make out a case for submission to a jury in a federal court are determined by the Seventh Amendment to the Constitution of the United States, the Federal Rules of Civil Procedure [28 U.S.C.A.] and the decisions of the courts of the United States. White v. New York Life Ins. Co., 5 Cir., 1944, 145 F.2d 504; Wright v. Paramount-Richards Theatres, 5 Cir., 1952, 198 F.2d 303; Reuter v. Eastern Air Lines, 5 Cir., 1955, 226 F.2d 443; and Continental Casualty Co. v. Holmes, 5 Cir., 1959, 266 F.2d 269; and cf. Dick v. New York Life Ins. Co., 1959, 359 U.S. 437, 79 S.Ct. 921, 3 L.Ed. 2d 935."

The scope of the Supreme Court's view on protection of jury trial in diversity cases is indicated by its recent decisions sustaining the sufficiency of evidence to support jury verdicts in cases in which federal courts had set them aside.[4]

In Byrd v. Blue Ridge Rural Elec. Coop., 1958, 356 U.S. 525, 536–539, 78 S.Ct. 893, 901, 2 L.Ed.2d 953, 962–963 the Court,[5] while reserving decision on the constitutional law question of the extent to which the Seventh Amendment protects the right of jury trial in diversity cases tried in federal courts, spoke as follows:

"An essential characteristic of [the federal system] is the manner in which, in civil common-law actions, it distributes trial functions

1. Erie Railroad Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

2. Guaranty Trust Co. of New York v. York, 1945, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079.

3. Wright v. Paramount-Richards Theatres, 5 Cir., 1952, 198 F.2d 303, 305; Gillen v. Phoenix Indemnity Co., 5 Cir., 1952, 198 F.2d 147; Reuter v. Eastern Air Lines, 5 Cir., 1955, 226 F.2d 443; Pogue v. Great Atlantic & Pacific Tea Co., 5 Cir., 1957, 242 F.2d 575, 582; Atlantic Coast Line R. Co. v. Futch, 5 Cir., 1958, 263 F.2d 701, 707–709 (dissenting opinion); see Protection of Jury Trial in Diversity Cases Against State Invasions by Dean Leon Green, 35 Texas L.Rev. 768 (1957).

Smith v. Buck, 9 Cir., 1957, 245 F.2d 348, 349. "In considering a case of this kind, we should take note of the precedents established by the Supreme Court as to when it is proper to take a case from the jury. For although this is a diversity case, it was tried in a federal

court where considerations relating to the Seventh Amendment must prevail. It is incumbent upon us to be guided by such cases as Williams v. Carolina Life Insurance Co., 348 U.S. 802, 75 S.Ct. 30, 99 L. Ed. 633, and Gibson v. Phillips Petroleum Co., 352 U.S. 874, 77 S.Ct. 16, 1 L.Ed.2d 77."

4. Phillips Petroleum Co. v. Gibson, 5 Cir., 1956, 232 F.2d 13, reversed 352 U.S. 874, 77 S.Ct. 16, 1 L.Ed.2d 77; Eastern Air Lines, Inc. v. Union Trust Co., 1955, 95 U.S.App.D.C. 189, 221 F.2d 62, reversed at 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796; Atlantic Coast Line Railroad Co. v. Swafford, 5 Cir., 1955, 220 F.2d 901, reversed 350 U.S. 807, 76 S.Ct. 80, 100 L. Ed. 725; Carolina Life Ins. Co. v. Williams, 5 Cir., 1954, 210 F.2d 477, reversed at 348 U.S. 802, 75 S.Ct. 30, 99 L.Ed. 633.

5. See also Magenau v. Aetna Freight Lines, Inc., 1959, 360 U.S. 273, 278, 79 S.Ct. 1184, 3 L.Ed.2d 1224. Cf. Herron v. Southern Pacific Co., 1931, 283 U.S. 91, 51 S.Ct. 383, 75 L.Ed. 857.

between judge and jury and, under the influence—if not the command—of the Seventh Amendment, assigns the decisions of disputed questions of fact to the jury."

## II.

This Court also has focused on the problem facing a federal court in a diversity case applying decisions of the state courts of Louisiana where the common law jury does not obtain and Louisiana courts review the facts as well as the law in all civil cases.

"Federal courts are forbidden by the Seventh Amendment to re-examine any fact tried by a jury otherwise than according to the rules of the common law, while Louisiana state courts can review the facts in all civil cases. As a consequence of that situation, in civil jury cases federal courts evaluating decisions of Louisiana state courts as precedents have the difficult task of separating the decisions of the Louisiana courts on the law from the review of the facts." Wright v. Paramount-Richards Theatres, 5 Cir., 1952, 198 F.2d 303, 306. See also Gillen v. Phoenix Indemnity Co., 5 Cir., 1952, 198 F.2d 147.

Here, I fear, the Court has failed to make such a distinction in the Louisiana decisions cited.

## III.

Since the District Court instructed a verdict for defendant, the evidence, of course, must be considered in its most favorable light to the plaintiff with every fair and reasonable inference which the evidence justifies. When so viewed, it seems clear that the evidence presented genuine factual disputes properly to be decided by the jury.

Much is made of the fact that plaintiff gave two accounts of the accident. On direct examination, plaintiff reported this version.

"A. It was awful dark. There was some engines switching and it was foggy. I was walking beside the track, or near the track. I stepped in a hole and fell into the train. I remember I tried to catch up on the train. I was walking along by it, walking along near the track; when the train hit me it was going north too.

"Q. Did you hear that train or did you see that train before it hit you?

\* \* \* \* \* \*

"A. No, I didn't see it.

"Q. Did you hear it? A. I guess I heard it, yes sir.

"Q. Did you know where it was or what direction it was from you? A. No, I don't know how far it was from me.

"Q. Did you know whether it was coming on the track that was close to you or not? A. No, sir, I don't. It was dark. I don't know how many tracks was there."

On cross examination, plaintiff responded in the following vein.

"Q. And then, I believe you said that you were walking along side a track and stumbled into the engine. Is that it? A. Something like that, I guess.

"Q. And this is how the accident happened?

"(Witness nods his head).

"Q. Was your answer yes? A. That engine was coming backwards, I'm sure.

"Q. What makes you sure? A. Well, I think I'm sure.

"Q. But you stumbled into it? A. Yes.

"Q. And that is how the accident happened? Is that right? A. That is how I got hurt.

"Q. Is your answer yes to that question? A. Yes."

But when plaintiff's attorney on redirect examination attempted to clarify the testimony somewhat clouded on cross, the Court sustained the objection that it was repetitious.

Taking the evidence in the light most favorable to the plaintiff, as we must, the jury was entitled to find the following facts. On a dark and foggy night, plain-

tiff was walking along several sets of tracks in the railroad yards in the corporate limits of the town of Hammond. The tracks were frequently used by pedestrians as a wayfare. Behind him, a train operated by the Railroad was backing on the track along which he was walking. The train consisted of a locomotive, tender, and caboose.[6] The backing train had a dim tank light with no reflectors on the back of the tender.[7] No whistle was blown. No brakes were applied. No one was preceding the cars on the backup operation. No one was riding on the car being pushed.[8] No crewman ever did see plaintiff before the accident.

The engineer was backing the train. He testified that he was keeping a lookout. However, he never did see the plaintiff who was not on his side of the tracks, but he testified that the fireman was in the engine keeping a lookout on the other side.[9]

Based on this testimony, the Court holds that the engineer and the fireman "were [both] keeping a sharp lookout." Of course, this again was a factual issue on which the jury was entitled to pass on the credibility of the testimony of this interested witness. On his own story it was evident that neither might have been able to see plaintiff in view of the position and length of the cars, the light,

6. There is some confusion whether the caboose was attached to the head of the locomotive and was thus being pulled by the locomotive which was pushing a 40-foot long tender, or whether it was attached to the tender and was thus the lead car being pushed. This Court finds that the caboose was attached at the head of the locomotive. The evidence, however, was conflicting. This dramatizes how far the Court's action goes in taking over the jury's function in this type of factual dispute which a jury traditionally and properly resolves.

7. The engineer testified about the lighting on the train.

"Q. Now, describe what you have on the front of the engine where you can see down the track. I am talking about the front. A. On the head end?

"Q. The head end. A. Have a headlight.

"Q. On the back of the tender, what do you have? A. You have a tank light. It's a tank light and a case I would think about a hundred watt bulb—sixty to a hundred watt bulb.

"Q. What was the purpose of the light on the rear? A. The purpose was for people to see it or anyone to see it.

"Q. Would it give you any vision down the track? A. To a certain extent, but not too much.

"Q. Not too much? A. No, sir.

\* \* \* \* \*

"Q. Now, in backing up, do you recall the night of this accident, whether it was clear, moonlight, or what the condition was? A. It was smoky and foggy.

"Q. Smoky and foggy? A. Yes, sir.

"Q. Did that tend to limit the vision on the night? A. Yes, sir."

8. The engineer recounted as follows:

"Q. What did the tender have on the bottom of it in the back? A. What did it have?

"Q. What did it have in the way of a place where a brakeman or anyone could ride? A. It had a foot board back there.

"Q. Foot board? A. Yes, sir, what we call a foot board right on the back of the engine about five or six inches above the rail.

"Q. Do you have a railing? A. Has a hand railing on the side of it.

"Q. That a person could hold onto? A. Yes, sir.

\* \* \* \* \*

"Q. Was anybody riding that step or foot rail on the back end of the tender? A. No, sir.

"Q. State to the jury whether or not any of the crewmen were preceding you or going down the track the same direction that you were going, ahead of the tender and the engine, with the electric light. A. No, sir."

9. Engineer's testimony.

"Q. Were you keeping a lookout when you were backing up? A. Yes, sir.

"Q. Keeping a lookout there, did you or were you able to see Mr. Rutherford before the accident there? A. Mr. Rutherford wasn't on my side.

"Q. Do you know whether or not your flagman was keeping a lookout? A. I know my fireman was.

"Q. I mean the fireman. A. Yes, sir. The fireman was on the lookout.

\* \* \* \* \*

"Q. Did your fireman tell you or indicate to you that there was anyone on the track? A. No, sir."

condition of the weather, and position of plaintiff and the engineer and fireman.

The reasonableness of the safety precautions—such as the use of a dim tank light when a train is backed as freely as operated forward, the absence of any person on the lead car being pushed whether that car was a caboose or a 40-foot long tender—especially in view of the dark and foggy weather conditions in a switchyard frequented by pedestrians is patently a genuine issue of fact traditionally to be determined by a jury. But this Court has ruled that as a matter of law the precautions and conduct of the train crew were reasonable and not negligent.

### IV.

Moreover, the Court has ruled that as a matter of law the plaintiff was contributorily negligent. Viewing the evidence in the light most favorable to the plaintiff, as we must, I feel it presents factual issues on which reasonable minds might differ. The plaintiff did not see the train behind him backing toward him. He thought he heard trains in the switching yard, but he did not hear this train. As he was walking along the track, he stumbled and fell and was struck by the train and was severely injured. The Court in a mixture of law declaring and fact finding says "If Rutherford had been exercising ordinary care, he would have seen the light on the tender of the train; if he had been listening, he would have heard the noise of the steam engine." But the evidence is that he was walking with his back to the train and that the light on the train was very dim. Further he recounted—or tried to—that he stumbled and fell. This evidence once again manifestly pre-

sents factual issues to be determined by the jury—not the judge.[10]

### V.

Finally, this Court rules out completely the doctrine of last clear chance or discovered peril. Brown v. Louisville & Nashville R. Co., D.C.E.D.La.1955, 135 F.Supp. 28, 31, affirmed 5 Cir., 234 F.2d 204, sets forth the various elements of the doctrine as it is applied in Louisiana. "As applied by the courts of Louisiana, the doctrine of last clear chance is composed of the following elements: (a) plaintiff is in a position of peril of which he was *unaware or unable* to extricate himself; (b) defendant in a position where he actually discovered, *or should have discovered*, the plaintiff's peril; (c) at such time that the defendant could have, by the exercise of reasonable care, avoided the accident." (Emphasis added.) Last clear chance does not depend solely on inability of one in peril to extricate himself from a perilous position. An unawareness that he is in a perilous position which the defendant could reasonably discover and thus by the use of ordinary care with the means then at hand have avoided the accident is sufficient.

This Court reaches the crucial fact finding that the Railroad could not have reasonably discovered plaintiff's perilous position at such a time that it could, by the exercise of ordinary care, have avoided the accident. If the lighting had been brighter, if someone had been on the lead car, if the lookout had been keener—matters which the jury could reasonably find would be ordinary precautions under all the circumstances necessary actually to discover persons on the track whose general likelihood of presence had to be anticipated—surely a

---

10. Louisiana regards it as a fact question. Gibbs v. Illinois Cent. R. Co., 1929, 169 La. 450, 125 So. 445, 446, 447.

"It is contended * * * that, when a person in full possession of his faculties is struck by a train while walking on a railroad track, the recovery of damages will be denied. * * *

"We do not understand that in the cases cited the court intended to lay down as

an inflexible legal proposition, by which the court should be guided, that any person who goes upon a railroad track and is run down and killed by a train is debarred from the recovery, regardless of the circumstances under which the killing occurred. The rule is that every case for damages for personal injury or death must be decided on the facts of that particular case."

**344**

jury could properly find that the Railroad should have reasonably discovered the plaintiff. That is all that Louisiana requires since unlike many jurisdictions, actual discovery of peril is not essential. A railroad is held to have known what in prudence it should have known. The action which a prudent railroad should then have taken—such as blowing the whistle, giving a warning or applying the brakes—was likewise within the province of the jury to evaluate.

Because the action of this Court takes over the function of the jury to resolve these factual disputes, I must respectfully dissent.